Milkman *v.* Ordway.

## SARAH MILKMAN *vs.* THOMAS T. ORDWAY & others.

**In** a suit in equity for specific performance of a contract, relief in damages will be decreed where a defect of title, right or capacity of the defendant to fulfil the contract is developed by his answer or at a subsequent stage of the proceedings; provided that the plaintiff filed the bill supposing and having reason to suppose himself entitled to a specific performance, and would be so entitled but for such disability.

**A** person occupying a store as undertenant of a lessee thereof filed a bill in equity against him and his landlord, to restrain them from cancelling the lease, and to compel a specific performance of a written agreement of the lessee, with the plaintiff for her occupation of the store during the whole term of the lease; she contending in good faith that he held the lease on a trust, founded upon this agreement and previous negotiations relating to the lease, to serve her right of occupation, and that his landlord had notice of the trust and assented to it; and being ignorant of the facts, developed by the landlord's answer and afterwards established in the proofs, (1) that the lease was cancelled three days before the bill was filed; (2) that it was cancelled in consideration of the cancellation of another lease, whereby counter-equities arose in the landlord's favor; (3) that it was expressed to be on condition that if the lessee should underlet the landlord might enter and determine it; and (4) that until after the cancellation the landlord was ignorant of her written agreement with the lessee and supposed her relation to him to be only that of a tenant at will. *Held,* that the bill must be dismissed against the landlord, but should be retained against the lessee and relief afforded in damages for his breach of the agreement with the plaintiff.

BILL IN EQUITY, sworn to February 5, 1869, and filed February 6, 1869, by Sarah, wife of Bernard Milkman, against Thomas T. Ordway, George F. Ordway and William Cumston.

The bill alleged that on or about July 1, 1864, the plaintiff entered into an agreement with reference to her sole and separate personal property, with the Ordways, who were partners doing business in Boston under the name of Ordway Brothers, by which, among other things, they agreed for a valuable consideration to guarantee the payment by her of the rent which should come due under a lease to be executed to her by Cumston, of the lower

floor and basement of a building numbered 339 cn Washington Street in Boston, for the term of eight years, to begin September 1, 1864, at a yearly rent of $1800 and the taxes; that it was on the same day agreed and understood by and between " the said parties " and the plaintiff, that the Ordways should take the lease in their own name, but in trust for the benefit of the plaintiff for the said term of eight years, in consideration of the payment to them by her of the sum of $200 on the first day of each and every month of the term, and the Ordways would pay to Cumston the rent for the premises at the annual rate of $1800 and the taxes, and if, at the expiration of the term of eight years, the plaintiff should continue to occupy the premises, the Ordways would pay back to her the difference between the amount she had paid them and the amount they had so paid Cumston for rent and taxes; and that the Ordways afterwards undertook to reduce this oral agreement to writing, and so wrote and signed and gave to the plaintiff a paper, of which the follow-- ing is a copy, and which Anton Prager also signed as a witness: " Boston, July 22, 1864.   The understanding with Ordway Brothers, in relation to the store now occupied by me on Wash- ington Street, is, that I am to have the store by promptly paying $200 on the first day of each month.   At the expiration of eight years, if I then continue to hold the store, I am to have paid back to me the difference between what they have paid out for rent, taxes, &c., and the amount I have paid them for that time. Rent of store is to be $1800 per year, and taxes, as assessed by Mr. Cumston; " but that, by the mistake or fraud of the Ordways, and oversight of the plaintiff, her name was omitted from the writing, and in consequence said writing is in its lan- guage and meaning vague, and does not adequately or fully express the intention and agreement of the parties thereto ; that, at the time of making the writing, the plaintiff had not the advice or assistance of any person, and did not understand the document to read as it does ; and that the agreement which was made be- tween her and the Ordways was not as set out in the terms which they thus signed on July 22, 1864, but was as would be expressed if said writing were reformed so as to read as follows:

"Boston, July 22, 1864. The understanding with Mrs. Sarah Milkman, in relation to the store now occupied by her on Washington Street, is, that she is to have the store by promptly paying $200 on the first day of each month. At the expiration of eight years, if she then continues to hold the store, she is to have paid back to her the difference between what we have paid out for rent, taxes, &c., and the amount she has paid us for that time. Rent of store is to be $1800 per year, and taxes, as assessed by Mr. Cumston."

The bill then alleged that, in pursuance of said agreement, the plaintiff began to occupy the premises on and from September 1, 1864, and continues to occupy them, and has fully and promptly complied with the terms of said agreement, and has, each and every month from the time the lease went into operation, paid, when due, from her own personal estate, to the Ordways, said amounts of $200 when they came due, and has paid the sum of $200 that came due February 1, 1869, and received from said Ordways in return an unconditional receipt therefor, signed by them, in these terms: " Boston, February 1, 1869. Received of Mrs. Sarah Milkman, $200 for rent of store 339 Washington Street;" that she fully believed that the Ordways would faithfully carry out the agreement as she and they understood it, and as it would be expressed if the writing were reformed, and would perform the trust reposed in them, and hold the lease for and during said term of eight years for her benefit, as agreed and as in justice and equity they are bound to do; that the Ordways are bound to hold the lease as above stated, or to assign it to her, and not to cancel or surrender it, and she has a right to occupy the premises for and during the residue of the eight years by paying the rent as aforesaid, and at the expiration of the eight years the Ordways will be bound to pay to her a certain sum as the excess of rent paid by her over and above the rent paid by them to Cumston; and that the Ordways are bound to continue to her the free and uninterrupted use and occupation of the premises under said lease, without let or hindrance.

The bill further alleged that Cumston was at the date of the lease fully informed of the agreement between the plaintiff and

the Ordways, and of her rights to the premises, and of the trusts reposed in and assumed by the Ordways; and that he has no right to cancel the lease without the consent of the plaintiff, or to disturb her in the occupation of the premises, but is bound to continue to her the use thereof for the remainder of the term.

Finally the bill charged that the Ordways and Cumston, combining and confederating, &c., " and falsely pretending that the plaintiff has not complied with the terms of said agreement, and that she has broken it and so has no right to the use and occupancy of said store and the benefit thereof, have threatened to cancel, or agreed to cancel, or have cancelled, said lease ; " and that they " have discharged each other, or propose to discharge each other from, for or on account of the same, with the intention of depriving the plaintiff of the possession of said store and of preventing her from enjoying her just rights aforesaid, and in pursuance of such intention have lately given her a notice to quit the premises," which was annexed to the bill, and was a notice in the ordinary form, to quit in one month, addressed by Ordway Brothers to the plaintiff and her husband as their tenant at will, and dated January 1, 1869.

The prayer of the bill was for an answer; for an injunction to restrain the defendants " from executing their said intent as set out in said notice to quit, and from bringing any writ of ejectment or other process or proceeding whatever against the plaintiff with reference to the matters aforesaid or any of them ; " for a reformation of the writing in accordance with the allegations of the bill; for a decree for a specific performance of it so reformed; and for general relief.

Bernard Milkman joined with the plaintiff in the bill, " so far as any matter contained therein may affect or relate to his interests or rights."

The plaintiff afterwards on the same day filed an amendment by way of supplement to her bill, alleging that she was informed and believed that the defendants, or some one of them, had assigned the lease, or given another and new lease of the premises, to George M. Cloyes, in fraud of her rights; that Cloyes had notice of the agreement between her and the defendants; and

that she believed that Cloyes was intending to turn her out of possession of the premises in some way and by some means unknown by her, to her immediate and manifest wrong and irreparable injury, which could not be compensated by damages recovered in a suit at law; and therefore she prayed that Cloyes might be made a party defendant, and be enjoined and restrained from assigning said lease, or assigning or giving any lease of the premises, or taking any proceeding or process or doing any act to turn her out of possession of the premises, until the further order and decree of this court, and that, if it should be that Cloyes had such a lease, it should be decreed of no effect.

Upon the amended bill an injunction was issued, commanding the defendants, until the further order of the court, or some justice thereof, " to refrain from cancelling, discharging or assigning a lease dated on or about the 22d day of July, A. D. 1864, of the store numbered 339 on Washington Street in said Boston, which lease was signed by the said Cumston and said Ordways, and also from taking possession of said store, and from preventing the said Sarah Milkman from occupying said store, and from disturbing her quiet and peaceable possession and occupation of the same, and from bringing any action or writ of ejectment or other process against the said Sarah for the purpose of ejecting her from said premises ; " and further commanding Cumston and Cloyes " to refrain from executing or delivering or receiving any assignment, cancellation or discharge of the above named lease, and also from signing, sealing or receiving any lease of said premises to or from any person or persons, and from taking any proceedings or process, and from doing any act, tending in any way to disturb said Sarah in said possession of said premises, or from turning her out of or from said premises."

The Ordways, answering jointly on December 7, 1869, admitted that they were partners under the name of Ordway Brothers on July 1, 1864, and that they signed the writing alleged in the bill denied that they ever agreed to guarantee payment of rent to become due from the plaintiff under a lease of the premises to her from Cumston, or ever agreed with her to take, or that they had taken, a lease thereof for eight years in their name but in trust

for her or for her benefit; denied any fraud or mistake in respect to the writing; alleged that it was carefully examined by her and Prager, the witness of it, who was her son in law and adviser, and that it was fully understood by her; denied that there ever was any agreement between them and the plaintiff in the sense of the writing as prayed by her to be reformed; denied that she ever occupied the premises by force of said written agreement; admitted that she did occupy the premises from September 20, 1864, to February 1, 1869, but alleged that she did so as their tenant at will, and denied that she was their tenant till said first date or after said second date; and admitted that they gave her the notice to quit, by her alleged.

They also answered " that in the year 1864 they were wholesale dealers in millinery goods, and the plaintiff was a retail dealer in the same goods at 339 Washington Street, and was then living apart from her husband; that before that time she had lived with her husband, and had carried on business with him, but not successfully; that since she had lived apart from him she had had greater success; that in the summer of 1864 she was a customer of Ordway Brothers, and informed them that she could not hire the store of Cumston, but wished that they would hire it and let her occupy it as their tenant at will; that she assured them that she could do business successfully, being now living apart from her husband, and he was then in California and would not return, and if he did she would never live with him; that she wished that they would hire the store and take her as their tenant; that, if they would hire the store and permit her to occupy it as their tenant, she would purchase all her goods of them, and indemnify them against loss by paying them an advance over the rent paid by them; and that they at length agreed, in consideration of her agreement to make all her purchases from them of such goods as they kept and she needed in her retail business, and of her agreement to do business by herself and to live apart from her husband and not to have anything to do with him thereafter, that they would strive to get the lease of the store : and that the alleged writing was by them written as containing that part of the understanding between them which had reference to the terms upon

which they would take her as a tenant at will, provided she should continue to purchase all her goods of them and should live apart from her husband, and it was well understood and agreed that, if she should fail to make her purchases of them, or if she should again live with her husband, or if he should have anything to do with the business in the store, they were to be no longer under any obligation to permit her to occupy the store."

Further answering, they denied any combination or confederation with Cumston, but alleged " that they applied to Cumston to be allowed to surrender and cancel a lease made by him to them of a factory situated in the rear of 339 Washington Street, and he was unwilling so to do unless they would also surrender the lease of 339 Washington Street, and after some negotiations they agreed to surrender and cancel said lease, and the same was surrendered and cancelled on February 3, 1869, but as of February 1, 1869."

And finally they alleged, " that, if any agreement made or understanding had between them and the plaintiff in 1864 was ever binding upon them, the same is so no longer binding upon them, for they say that since 1864 the plaintiff has failed to purchase goods of them as she then agreed to do, and has ceased to have sole charge of said store, and has permitted Bernard Milkman to have charge and management of the same, and has in consequence thereof, as they believe, failed in business, and been unable to pay her debts ; and during a part of the period which has elapsed Bernard Milkman has carried on business in the store, and so has injured the business carried on therein ; all which it was expressly understood between the plaintiff and Ordway Brothers should not be done or permitted ; and so they say that any agreement or understanding between them and the plaintiff has become and is void and of no effect, if the same was ever a valid and binding agreement."

Cumston answered, on the same day, that he was ignorant whether any agreement was made by Ordway Brothers with the plaintiff as alleged by her, and if there was any such agreement it was made without his knowledge ; and denied that he made any lease to Ordway Brothers at the time alleged by the plaintiff, or

that they agreed to take a lease of the premises in trust for her.

He also answered " that, prior to September 1, 1864, he was lessee of the whole building of which the premises 339 Washington Street and the basement under the same formed a part. and the plaintiff had occupied said premises as his tenant at will; that, shortly prior to that date he had determined to repair the store and lease the premises to other parties ; that he had many applications to lease the premises, and among others Ordway Brothers applied to him for the store, but did not apply to him for it in any way as the agents or on account of the plaintiff, or as in any way connected with her, but solely on their own account, as he then believed and now believes, and that he had no reason to believe that they proposed in any way to take the premises in trust for, or on account of, or in any way connected with, the plaintiff; that, some time early in September 1864, he concluded an arrangement with the Ordways, whereby he agreed to lease the premises to them, which agreement was consummated on September 20, 1864, by the execution of a lease of the store to them ; that by the terms of this lease it was agreed that they should not underlet the premises without his consent, and accordingly they applied to him to permit them to underlet to the plaintiff as their tenant at will, representing to him that she was one of their customers, and was then living apart from her husband, and had agreed so to continue to live, and would be an unobjectionable tenant, and he therefore gave his consent by parol to the Ordways to permit her to become their tenant at will; that afterwards, on August 28, 1866, Ordway Brothers leased of him a factory in the rear of the store 339 Washington Street, for six years from October 1, 1866, which factory might be occupied in connection with the premises 339 Washington Street, and he then supposed Ordway Brothers intended to remain in occupation of said store 339 Washington Street in connection with the factory; and that Ordway Brothers, being so the lessees of the two premises, at various times during the year 1868 applied to him to be allowed to surrender the lease last mentioned, but he declined so to do unless they would also· surrender the lease first mentioned

and give him peaceable possession of both premises, and they at length agreed so to do, and on February 3, 1869, they surrendered both said leases to him, and he accepted such surrender and the leases were on that day cancelled, the same to take effect as of February 1, 1869."

Further answering, he denied that he knew anything of the writing signed by Ordway Brothers, and set forth in the bill, or ever saw it until some time in January 1869, when the plaintiff exhibited it to him and said that she had heard that Ordway Brothers were negotiating with him for a surrender of the prem·ises, that she wanted to show him a paper which she held, signed by them, and that she had supposed that this paper gave her a right to occupy the store during their lease, but she had found it was of no value. And he alleged " that he then informed the plaintiff that he was desirous of protecting himself and getting his rent from the Ordway Brothers; that one of the Ordways had failed and he feared he should not collect his rent, and that in order to secure himself against possible loss he should be obliged to accept the surrender of both leases, so that he might lease the premises in connection with each other, and, if they should not be taken by a party then in negotiation with him, he would lease the whole of them to her at the same rent as was reserved in the leases, after such surrender should have been made by Ordway Brothers; that she then said she thought she would take the same, and would let him know shortly; that soon afterwards he ralled on her to learn what her decision might be thereon, and she informed him that she had decided to leave the premises and had made arrangements for another store; and that, shortly after said conversation, she caused to be posted in the window of her store at 339 Washington Street a notice in large letters that she was about to remove from said store to a store in Temple Place, and about the same time she caused to be posted in a store on Temple Place a similar handbill in large letters, that the said store was soon to be occupied by her, and he was otherwise informed that she did hire a store of one Salisbury in Temple Place; and that he had no other interviews with the plaintiff, and supposed that she was intending to remove to Temple Place,

and heard nothing from her, until after the surrender of said leases had been made, and until service upon him in this case."

He further answered, denying that he had done anything in regard to the estate other than he thus set forth, or anything that he might not lawfully do in the premises, or anything to the plaintiff's wrong or injury ; and finally he denied any and all unlawful combination and confederacy.

The plaintiff filed a general replication, and at October term 1870 the case was heard by *Wells*, J., who made a report thereof to the full court.

It appeared in evidence at the hearing, " that the plaintiff had occupied the store numbered 339 on Washington Street in Boston, and the basement under the same, for a number of years as a tenant of Cumston, first under a lease for a few years, and afterwards at will at the rent of $1200 per annum and taxes, and during all that time carried on in the store a retail millinery business on her sole and separate account, and having duly filed the certificate in that respect required by law; that, while she was so occupying the store and basement, about June 1, 1864, Cumston called upon her and informed her that he had an opportunity to let the store and basement on an eight years' lease with good security, for the rent of $1800 a year and taxes; that she told him that she would take the lease for that time and upon these terms, and find some one who would become security for her, and he told her she might have it on the same terms, and that she should have the preference if she got security; that she mentioned to him Ordway Brothers, and others ; and that he expressed himself satisfied with Ordway Brothers."

It also appeared in evidence, " that she at that time dealt with the firm of Ordway Brothers, composed of the defendants Thomas T. and George F. Ordway, who were engaged in the wholesale millinery business in Boston, and that she applied to them to become security for her upon a lease to herself ; that they declined to become sureties for her, but, after some negotiations in relation to the matter, drew up two papers, one of which was signed by them and delivered to her, the other signed by her and delivered to them." The first of these papers was the writing,

signed by Ordway Brothers, which was set forth in the bill. The second was a duplicate thereof, signed by the plaintiff instead of by Ordway Brothers.

It further appeared that subsequently an indenture of lease of the store and basement was executed by and between the Ordways and Cumston, but not until early in September 1864, "for some reason," although the terms of it were agreed upon early in July 1864, before the execution of the papers which were signed and interchanged between Ordway Brothers and the plaintiff; and that this lease was never recorded. This was the lease referred to by all the parties, in the pleadings. It bore date of September 1, 1864, and was acknowledged by Cumston September 20, 1864. By it, Cumston demised the store and basement to the Ordways for eight years for an annual rent of $1800, payable in quarterly instalments, and taxes; and the lessees covenanted, among other things, not to assign the lease or underlet the whole or any part of the premises without the written consent of the lessor or those having his estate therein; and it was expressed to be on condition that, if the lessees, or their representatives or assigns, should neglect or fail to perform or observe any or either of their covenants therein, the lessor might without further notice or demand enter on the premises and resume possession thereof, and upon such entry the term of the lease should end.

It appeared " that, by an arrangement and agreement between the plaintiff and the Ordways, she was to pay and did pay to Cumston up to September 1, 1864, rent and taxes at the old rate, and that her rent to the Ordways was to commence from that date; that she continued to occupy the store and basement all the time until this bill was filed; and that, the injunction having issued in this case against the Ordways and Cumston, she still continued to occupy the premises after the bill was filed, down to and at the time of the hearing and decree; that she duly paid to the Ordways, under the instruments," signed and interchanged by them, " $200 on the first day of each month, including the first day of February 1869; and that they paid to Cumston the rent and taxes payable under the lease, regularly, in conformity

with the terms of the lease, including all that was payable at the time of the cancellation hereafter to be mentioned."

It also appeared " that the Ordways, having a lease from Cumston, mentioned in his answer, and dated August 28, 1866, of premises in the rear of said store, and the rent under that lease being twelve months in arrear, prior to January 1869 applied to Cumston for leave to cancel and surrender that lease; that he declined to accept such cancellation and surrender unless they would also cancel and surrender the other lease; and that it was finally agreed between the Ordways and Cumston that both leases should be cancelled and surrendered, and on February 3, 1869, the same were surrendered to Cumston by the Ordways and cancelled," the cancellation of the lease of the premises in question in this suit being by an indorsement thereof, signed by the lessor and lessees, under date of February 1, 1869, in these words: " The lessees under the within lease hereby surrender the same to the lessor, and the lessor accepts said surrender."

It also appeared that in the summer of 1867 or soon afterwards George F. Ordway failed and withdrew from the firm of Ordway Brothers, which thenceforth was carried on by Thomas T. Ordway alone.

It further appeared that under date of December 1, 1868, Ordway Brothers wrote to the plaintiff that the lease of " her store " would cease with that month, that " any new arrangement for the store after that time " would have to be made with Cumston, and that if she wanted the store longer it would be necessary for her to see Cumston, as after January 1 Ordway Brothers would have nothing to do with it; that under date of December 9, 1868, George F. Ordway wrote to the plaintiff that Cumston said he was willing to rent to her " the store and factory together," for the same rent which Ordway Brothers had been paying him, and only wanted to " make himself whole on the rent," and the writer advised her to make some arrangement with Cumston at once, as other parties might " be after it; " that Ordway Brothers under date of January 1, 1869, gave the plaintiff the notice to quit, as alleged in her bill; and that the plaintiff had no knowledge or information of the surrender of their

leases, by Ordway Brothers to Cumston, until after the leases had been surrendered and cancelled, other than as may be inferred from the two letters of the 1st and 9th of December 1868 above mentioned, and did not know, until after its surrender and cancellation, what was the form of the lease from Cumston to them of the premises which she was occupying, but supposed that it was taken and held by them for her benefit; and the judge found, on all the evidence, that Cumston " never gave any consent to any assignment of the lease " of said premises, but knew, all the time, of the occupation of them by the plaintiff, though he did not know, until a short time before the lease was cancelled, of the existence of the instruments signed and interchanged between the Ordways and the plaintiff, or of any arrangement between them and her, except that he supposed that she was their tenant at will.

The Ordways contended, at the hearing, that, before and at the time when the said instruments were signed and interchanged between themselves and the plaintiff, and as a part of the consideration upon which they executed the instrument to her, an oral agreement was made between her and them, such as was alleged in their answer; and they offered evidence of such an agreement. To the admission of this evidence the plaintiff objected; but the judge admitted it *de bene esse*, subject to the objection, and to revision by the full court both on questions of law and fact, and reported it in detail.

The substance of it was the testimony of the two Ordways that such an agreement was made between the plaintiff and their firm, and was broken by her by admitting her husband to participate in her business and by ceasing to purchase from them. There was other testimony that the premises occupied by the plaintiff could have been let for from $800 to $1000 per annum more annual rent than was reserved by Cumston in his lease to them; and the Ordways offered to testify that their object in making the agreement with the plaintiff was to control her trade, but the judge ruled that it was incompetent for them to do so, " except so far as it was communicated to the plaintiff."

There was counter-evidence, on the part of the plaintiff; first, her own testimony, denying that she ever made any such agree-

ment with the Ordways; second, her own testimony that the reason why she ceased to buy of them was, that they charged her more than they did other customers for the same goods, and did not have the styles of goods suited to her customers; and the testimony of her husband that the prices which they charged her were higher than she could obtain the same goods for elsewhere; and third, evidence that for a year before she ceased to buy from them they knew that her husband was participating in her business, and dealt with him as her agent and associate. The defendants contended, and proposed to offer evidence to show that the reasons assigned by the plaintiff for ceasing to buy of them were not founded in fact; but the judge " declined to enter into that investigation."

Upon all the evidence thus introduced, the judge found and ruled that the Ordways had waived all objection to the participation of Bernard Milkman in the plaintiff's business, so that they were not entitled to avail themselves of that ground of defence; " that no such agreement had been established in relation to the purchase of goods for her store by the plaintiff from them, as would control the written contract, or the breach of which would defeat her right to occupy the premises or to recover damages for being deprived thereof;" and " that the understanding in regard to such purchases, which the testimony tended to show, and the discontinuance of such purchases for the reasons assigned, would not constitute a sufficient ground in equity to defeat the relief which the plaintiff sought."

The judge thereupon, on January 22, 1870, entered the following interlocutory decree: " This case having been heard upon the several allegations of the parties, and their respective proofs, and arguments of counsel having been fully heard and considered, it now appears, and such is the finding and adjudication of the court thereon, as follows, to wit: That the said Thomas T. and George F. Ordway did make and execute to the said Sarah Milkman the contract of lease as set out in the plaintiff's bill, under which contract the said Sarah Milkman entered upon the premises mentioned therein, and occupied the same as tenant of the said Thomas T. and George F. until the first day of February

last past, and paid to the said Thomas T. and George F. the sev-eral sums due as rent and for taxes under said contract up to that date ; that the right of the said Sarah Milkman to occupy said premises after said first day of February was terminated and de-feated by the said Thomas T. and George F., in violation of their said contract, the said Thomas T. and George F. being them-selves tenants for years under a lease from the other defendant, William Cumston, for the term of eight years, corresponding with the term limited in their contract with said Sarah Milkman, and having surrendered their said lease to the said William Cum-ston, and cancelled and annulled the same, whereby their estate in said premises was defeated and the right of the plaintiff to occupy the same was destroyed ; and the plaintiff was notified and required to vacate said premises ; that such termination and defeat of the plaintiff's right and occupation as tenant of said Thomas T. and George F. was without justifiable cause on the part of said Thomas T. and George F., and a breach of their con-tract with the plaintiff ; that the said William Cumston had no notice or knowledge of said contract of lease to said Sarah Milk-man and gave no assent thereto, and the same was not authorized by the terms of his lease to the said Thomas T. and George F., and was not valid in law as against him, nor binding upon him at law, nor in equity. It is thereupon ordered, adjudged and de-creed as follows, to wit :

" 1st. That as against the said William Cumston the injunction heretofore issued be dissolved, and the bill dismissed ; and that the said William Cumston recover judgment against the plaintiff for his costs.

" 2d. That, relief by way of specific performan e of said con-tract having failed by reason of the surrender to said Cumston of the lease as aforesaid, and the foregoing order discharging the said Cumston from further liability under these proceedings, the bill shall nevertheless be retained for the purpose of assessing damages against the said Thomas T. and George F. Ordway on account of the breach of their said contract with the said Sarah Milkman ; provided, that the plaintiff shall, before the first day of February next, vacate the premises aforesaid and surrender pos-

session of the same to the said Cumston; and shall also pay into court, subject to the order and disposal of the court, in addition to the sum of seven hundred and fifty dollars already paid in, the further sum of one thousand and fifty dollars, together with the amount of taxes, water rates and other assessments paid during the year last past on account of said premises, according to the terms of an agreement between said parties, by reason whereof the defendants have assented to the continuance of the injunction until the present time.

" 3d. Upon compliance with the condition of the foregoing order, the case shall be committed to a master to hear the parties, and assess the damages suffered by the plaintiff by reason of the breach of the contract aforesaid, and also to state the account between the parties of the rents, taxes, water rates and other assessments, and of the payments made on account thereof, according to the provisions of said contract, in the same manner as if said contract had been terminated by the expiration of the period limited therein."

The provisions of the decree, so far as related to the payment of money into court, were founded on an agreement of the parties. Mrs. Milkman duly complied with the terms of the decree; and the Ordways appealed therefrom, contending that, " for all the purposes of said decree as against them, the plaintiff has a complete remedy at law."

*J. D. Ball*, (*J. L. Eldridge* with him,) for the plaintiff, cited *Peabody* v. *Tarbell*, 2 Cush. 226; *Andrews* v. *Brown*, 3 Cush. 130; *Pingree* v. *Coffin*, 12 Gray, 288; *Franklin* v. *Greene*, 2 Allen, 519; *Clark* v. *Flint*, 22 Pick. 231; *First Congregational Society* v. *Trustees of Fund in Raynham*, 23 Pick. 148; *Massachusetts General Hospital* v. *State Assurance Co.* 4 Gray, 227.

*W. A. Field*, for the Ordways. The equitable jurisdiction of this court is limited to cases where there is not a plain, adequate and complete remedy at law; Gen. Sts. *c.* 113, § 2; which means, remedies at law as they exist under our statutes and according to our course of practice, and may exclude some cases of which the English courts of equity take jurisdiction. *Pratt* v. *Pond*, 5 Allen, 59. This bill was brought to reform a contract,

and for its specific performance when reformed ; and to restrain the defendants from disturbing the possession of the plaintiff in the store. So far as Cumston was concerned, it stated only inferentially that he executed a lease to the Ordways ; that it was in trust for the benefit of the plaintiff ; and that he knew this when he executed it ; and it prays that this trust may be enforced. The case reported to have been proved was, that, whatever the agreement was between the Ordways and the plaintiff, Cumston was ignorant of it, and not bound by it ; and that the lease disclosed no trust. And so, as against him, the proof failed altogether, and the bill was dismissed. As against the Ordways, it was found that the written contract between them and the plaintiff was complete in itself, and did not need reformation ; that the lease from Cumston to them forbade an assignment and underletting, and had been lawfully cancelled before the bill was filed ; and that specific performance was impossible and an injunction against them unnecessary, as they no longer had any estate in the premises. The case was retained and referred to a master solely for the purpose of assessing damages against the Ordways for a breach of their contract with the plaintiff. There was thus a fatal variance between the allegations and the proof ; and the evidence was incompetent. If an amendment to the bill had been offered and allowed, stating the case according to the evidence, the amended bill must have been dismissed as stating merely a case at law. The Ordways took the first opportunity they had, to object that the plaintiff had a plain, adequate and complete remedy at law, which was at the hearing ; and this is reserved in the report. The bill alleged a case of equitable cognizance ; and the objection could not have been taken by pleading, as in *Dearth* v. *Hide & Leather National Bank*, 100 Mass. 541.

There never was any case in which the court would have decreed a specific performance, even before the lease from Cumston to the Ordways was cancelled. That lease contained a covenant on their part that they would not assign or underlet, and was on condition that, if they should do so, Cumston might enter and determine the lease. The Ordways could not be decreed to execute a lease to the plaintiff, unless she obtained the consent thereto

of Cumston; and that, the report states, he never gave. To order them to make a lease to her without his consent would be to order them to break one contract for the sake of performing another, when the very performance of this other might determine all the interest both of the Ordways and herself in the premises. She was bound to make inquiry whether the lease from Cumston to the Ordways permitted an assignment or underletting, or to obtain Cumston's consent thereto. *Lewis* v. *Bond*, 18 Beav. 85. *Meara* v. *Meara*, 8 Irish Ch. 37. *Sainsbury* v. *Jones*, 2 Beav. 462, and 5 Myl. & Cr. 1. *Hamilton* v. *Royse*, 2 Sch. & Lef. 315. *Metcalfe* v. *Archbishop of York*, 6 Sim. 224. The papers interchanged between the Ordways and the plaintiff do not contemplate an execution of other papers which would have been specially ordered. If the plaintiff had proved the case as stated, the remedy, if any, apart from the reformation of the contract, was by injunction; and the mischief, if there was any, was done before the bill was filed. The damages, if any, are for a court of law. *Durell* v. *Pritchard*, Law Rep. 1 Ch. 244.

Neither is the case within the doctrine that the bill, having been brought for one equitable purpose which failed, will be retained for another under the prayer for general relief; for the relief granted, and the only relief possible, is not of an equitable nature. Nor is the case within the doctrine that all matters of a legal nature incidental to a suit of equitable cognizance will be determined by the court of equity; for there is no equitable matter to which damages are incidental. See *Hodges* v. *Pingree*, 10 Gray, 14. In *Russell* v. *Clark*, 7 Cranch, 69, 89, Chief Justice Marshall, in reference to equity jurisdiction over a claim purely legal, says that, " if the answer of the defendant discloses nothing, and the plaintiff supports his claim by evidence in his own possession, unaided by the confessions of the defendant, the established rules, limiting the jurisdiction of courts, require that he should be dismissed from the court of chancery, and permitted to assert his rights in a court of law." In the case at bar, the answers disclosed nothing; the plaintiff supported her claim by her own evidence, unaided by the confessions of the defendants; and her claim, if she has any, is purely a legal one. See also *Strick-*

*land* v. *Strickland*, 6 Beav. 77. In *Genet* v. *Howland*, 45 Barb. 560, which was a suit in equity brought to redeem a pledge of stock, in which the facts showed a conversion of the stock before the bill was filed, it seems to be admitted that under the old practice the bill would have been dismissed; but under the new practice in New York it was retained and the case sent to a jury, because the statute of limitations was a bar to an action at law.

Even if there ever was a case for specific performance, the cases of *Hatch* v. *Cobb*, 4 Johns. Ch. 559, and *Kempshall* v. *Stone*, 5 Johns. Ch. 193, were, in some respects, more favorable to the plaintiffs therein than the case at bar.

In *Andrews* v. *Brown*, 3 Cush. 130, a case argued in the year 1849, on the question of the sufficiency of a plea to a bill in equity, the court anticipates a defence that may be taken by answer, and considers the question whether, if the defendant has put it out of his power to perform his contract specifically, the court has the right to retain the bill and award compensation in damages. The opinion, so far as authority is concerned, rests mainly on *Denton* v. *Stewart*, 1 Cox Ch. 258, which the court says has never been overruled, although it would seem to have been regarded in England as overruled nearly forty years before. *Todd* v. *Gee*, 17 Ves. 273, 279, explains *Denton* v. *Stewart*, and announces the doctrine of the English high court of chancery, that specific performance in these cases of contract must have become impossible *pendente lite*, to entitle the plaintiff to a decree for damages. In the year 1839 Lord Chancellor Cottenham, in *Sainsbury* v. *Jones*, 5 Myl. & Cr. 1, 4, speaks of *Todd* v. *Gee* as expressly overruling *Denton* v. *Stewart*, and as if there was no doubt about it, and says, " Certainly, during the thirty years which have elapsed since that time, I have never supposed the granting any such relief as being within the jurisdiction of this court." See also *Blore* v. *Sutton*, 3 Meriv. 237. In *Woodcock* v. *Bennet*, 1 Cowen, 711, 755, cited in argument in *Andrews* v. *Brown*, the bill was dismissed, and the *dictum* seems to rest on *Denton* v. *Stewart*.

The court also, in *Andrews* v. *Brown*, seems to be of opinion that it is immaterial whether specific performance became impos-

sible by the act of the defendant before or after the filing of the bill. But Lord Eldon in *Todd* v. *Gee*, and Chancellor Kent in *Hatch* v. *Cobb* and *Kempshall* v. *Stone, ubi supra*, regard the distinction as of great importance. The court however says, 3 Cush. 135, 136, that " it does not appear that the plaintiff, when he filed his bill, was aware that the contract could not be specifically performed or decreed," and, although it cannot enter judgment upon the point, trusts that it will not be again raised in the further hearing of the cause. It is respectfully submitted that this is not such an adjudication as would prevent a reargument of the question if it were raised upon the same facts ; and that the case now at bar is distinguishable in many respects, particularly in that neither before nor after the bill was filed was the plaintiff entitled to a specific performance of anything, and must have known and was bound to know it.

*Peabody* v. *Tarbell*, 2 Cush. 227, 231, which was decided later than *Andrews* v. *Brown*, seems to have been put mainly upon the ground of the enforcement of a trust, in regard to which the plaintiff sought, among other things, a discovery.

*Cory* v. *Thames Iron Works & Shipbuilding Co.* 8 Law Times (N. S.) 237, arose since the passage of the chancery procedure amendment act of 21 & 22 Vict. *c.* 27, and the need of a decree of specific performance was removed by performance by the defendants *pendente lite ;* yet the vice-chancellor referred the question of damages to a court of law. See also *Bovill* v. *Hitchcock*, Law Rep. 3 Ch. 417 ; *Hythe* v. *East*, Law Rep. 1 Eq. 620.

It is plain from the bill and report, that the plaintiff in the case at bar must have known, when she filed her bill, that she had no right to a specific performance of anything from Cumston, and that the lease from Cumston to the Ordways had been cancelled. The bill was filed February 6, 1869. The letters which she received from the Ordways under dates of December 1 and December 9, 1868, gave her notice that after January 1, 1869, they would have no interest in the premises. The statements in the bill show that she believed that the lease had been cancelled, when she signed the bill. It cannot be said that she in good faith believed that she was entitled to specific performance, when she

filed the bill ; and the *dictum* in *Morss* v. *Elmendorf*, 11 Paige, 277, will not help her. *Wiswall* v. *McGown*, 2 Barb. 270.

This is not, strictly speaking, a bill of discovery ; and, as incidental to relief, everything disclosed in the answers could as well have been obtained by interrogatories to the defendants in an action at law. Nothing was disclosed in the answers that aided the plaintiff. In bills of discovery, if the discovery is not obtained by the answer, the bill must be dismissed.

The evidence of the oral agreement, which was admitted *de bene esse*, was competent : 1. Because the bill was for the reformation of a writing ; and the court will not reform a writing unless when reformed it expresses the whole agreement of the parties, and will hear oral evidence of what that agreement was. *Canedy* v. *Marcy*, 13 Gray, 373. *Glass* v. *Hulbert*, 102 Mass. 24, 33. 2. Because, although a court of equity will not specifically enforce a written agreement with a parol variation, yet it will not decree specific performance without such variation, if it be relied on and proved as a defence. The statute gives jurisdiction in suits for the specific performance of "written" contracts. Gen. Sts. *c.* 113, § 2. *Brooks* v. *Wheelock*, 11 Pick. 439. *Park* v. *Johnson*, 4 Allen, 259. The court will not specifically enforce a writing that was not intended to express the whole agreement between the parties. *Reed* v. *Whitney*, 7 Gray, 533, 538. *Ely* v. *McKay*, 12 Allen, 323. Nor one which does not contain a provision orally agreed upon by the parties, unless the plaintiff submits to perform the omitted provision ; and then only when, with the omitted provision included, the agreement is such that a specific performance ought to be decreed. *Dwight* v. *Pomeroy*, 17 Mass. 303, 329. 1 Story Eq. (10th ed.) §§ 770, 770 *a*, 770 *b*, and notes. *Woollam* v. *Hearn*, 2 Lead. Cas. in Eq. (3d Am. ed.) 404, and notes.

The judge found, upon all the evidence, that the Ordways had waived all objection to the participation of Bernard Milkman in the plaintiff's business ; and it is not open to us to question the correctness of that finding of fact here. The remainder of the agreement set up by the Ordways in their answer, namely, that it was agreed between them and the plaintiff, as a part of the

whole contract, that she should make all her purchases from them of such goods as they kept and she needed in her retail business, and that if she failed to make such purchases from them they were to be no longer under any obligation to permit her to occupy the store, is now relied on; and the questions are, whether it has been proved, and if proved, whether it has been waived, and if proved and not waived, what is the effect upon her case of a breach of it by her without cause. The agreement is not void as being against public policy, or as being one which she had no right to make.

If the whole contract between the parties is doubtful or indefinite, the court will dismiss the bill. If the plaintiff has not performed what was a part of the consideration of it, or a condition of its continuing validity, the bill must be dismissed. *Colson* v. *Thompson*, 2 Wheat. 336. *Boston & Maine Railroad* v. *Babcock*, 3 Cush. 228.

WELLS, J. It is settled, with little or no conflict of authority, that when a defendant in a bill in equity disenables himself, pending the suit, to comply with an order for specific relief, the court will proceed to afford relief by way of compelling compensation to be made ; and for this purpose will retain the bill, and determine the amount of such compensation, although its nature and measure are precisely the same as the party would otherwise recover as damages in an action at law. The character of the investigation is, therefore, not an insuperable objection to this mode of proceeding.

There is also authority, though apparently questioned in the English decisions, for the application of the same rule when the disability was caused before suit, but after the date of the agreement relied on. In this country it seems to be generally accepted as the rule, provided the plaintiff brought his bill without knowledge of the disability, in good faith seeking equitable relief, supposing and having reason to suppose himself entitled to such equitable relief.

In the opinion of a majority of this court, there is equal ground in equity for applying the same rule, with the same qualifications, to all cases where a defect of title, right or capacity in

the defendant to fulfil his contract is developed by his answer, or in the course of the hearing, or upon reference of his title or capacity, after an order of fulfilment.

The rule assumes, of course, a sufficient contract, performance or an offer to perform by the plaintiff, and every other element requisite, on his part, to the cognizance of his case in chancery; and that the special relief sought is defeated, not by any defence or counter-equities, but simply because an order therefor would be fruitless, from the inability of the defendant to comply. The jurisdiction is fixed by establishing the equitable right of the plaintiff. Relief might then be given by a decree in the alternative, awarding damages unless the defendant should secure the specific performance sought. In many cases, this would be an effective and proper course; inasmuch as the defendant, although not having himself, at the time, the title or capacity requisite for such performance, might be able to procure it otherwise. The jurisdiction is not lost, when the court, instead of such alternative decree, determines to proceed directly to an award of damages or compensation. The peculiar province of a court of chancery is, to adapt its remedies to the circumstances of each case as developed by the trial. It is acting within that province when it administers a remedy in damages merely, in favor of a plaintiff who fails of other equitable relief, to which he is entitled, without fault on his own part. The diversity of practice in this respect, and the doubt as to the jurisdiction, we think must have arisen less from the nature of the relief to be afforded than from the character of the means for determining the amount of compensation to be rendered.

The usual mode of determining such questions in chancery is by reference to a master. If however the case be such as to require a jury to assess the damages, or to make that the more appropriate reference, it is then a matter of convenience and discretion only, whether to order such an assessment, upon an issue of *quantum damnificatus*, or to dismiss the bill and remit the parties to a trial in an action at law. The reason, from convenience, for sending such cases to an action at law, which often prevailed in the disposition made of them in the English practice, does **not**

exist under the system in use in this Commonwealth, by which chancery powers are vested in the same court which exercises jurisdiction at law. See *Cory* v. *Thames Iron Works & Shipbuilding Co.* 8 Law Times (N. S.) 237; *Nelson* v. *Bridges*, 2 Beav. 239. So also of the doubt arising from the different nature of the two jurisdictions, and their comparative fitness for such investigations. *Bovill* v. *Hitchcock*, Law Rep. 3 Ch. 417. The objections to the trial of such questions in chancery proceedings are still further removed in this Commonwealth, by the recent provision introduced by the practice act, Gen. Sts. *c.* 131, § 60, that "in proceedings in equity the evidence shall be taken in the same manner as in suits at law, unless the court, for special reasons, otherwise directs;" as well as by the provision giving authority to order issues of fact to be tried by a jury either at the bar of the supreme judicial court or of the superior court. Gen. Sts. *c.* 113, § 22.

The cases of *Denton* v. *Stewart,* 1 Cox Ch. 258, and *Greenaway* v. *Adams*, 12 Ves. 395, which assert doctrines substantially like the propositions above stated, are supposed to have been overruled by Lord Eldon in *Todd* v. *Gee*, 17 Ves. 273. It is so distinctly declared by Lord Cottenham in *Sainsbury* v. *Jones*, 5 Myl. & Cr. 1. The opinions in the two latter cases do indeed restrict the right to have damages assessed in equity, to cases where the defendant has become disabled *pendente lite*. Lord Eldon in *Todd* v. *Gee* indicates that *Denton* v. *Stewart* decided nothing more than that. But, in a note to the report of the defendants' argument in the case, *Denton* v. *Stewart* is cited from the note of Sir Samuel Romilly as a case where the defendant had assigned his title after the agreement with the plaintiff; and in *Greenaway* v. *Adams*, Sir William Grant says of *Denton* v. *Stewart*, "for in that the inability of the party to perform the contract grew out of an act done by the party after the contract had been entered into."

In *Sainsbury* v. *Jones*, Lord Cottenham speaks of Sir William Grant's case, *Gwillim* v. *Stone*, 14 Ves. 128, as one in which he refused to follow his own previous decision in *Greenaway* v. *Adams*. But in *Gwillim* v. *Stone* Sir William Grant says, after referring to *Denton* v. *Stewart* and *Greenaway* v. *Adams*: "This

bill is of a different nature, asserting from the first that the de-
fendant cannot make a good title." So far from refusing to follow
his previous decision, he appears to us not only to affirm both de-
cisions referred to, but to indicate where the true line of distinc-
tion is to be found. That distinction turns upon the character of
the claim which the plaintiff establishes, and not upon the time
or mode in which the defendant became unable to respond to a
decree of the court for specific relief.

If, at the time the bill is filed, the plaintiff is aware that the
defendant is unable to fulfil his contract, and that he can there-
fore have no equitable relief, " it is then reduced to the case of a
bill filed for the sole purpose of assessing damages for a breach of
contract." Per Kent, C., in *Kempshall* v. *Stone*, 5 Johns. Ch.
193. Chancellor Kent regarded " such knowledge a material cir-
cumstance in the case." The same consideration is mentioned in
*Hatch* v. *Cobb*, 4 Johns. Ch. 559. See also *McQueen* v. *Chou-
teau*, 20 Missouri, 222. In *Phillips* v. *Thompson*, 1 Johns. Ch.
131, and *Parkhurst* v. *Van Cortlandt*, Ib. 273, the bill was re-
tained for assessment of damages only, upon the principle of the
decision in *Denton* v. *Stewart ;* and the authority of that case
was distinctly recognized. The same eminent chancellor, in the
case of *Woodcock* v. *Bennet*, 1 Cowen, 711, ordered a reference
to a master to assess damages, because, since the execution of the
agreement, the defendant had disenabled himself to perform it.
In the court of errors, the bill was dismissed upon other grounds;
but the opinion delivered by Woodworth, J., approves of the
doctrine of *Denton* v. *Stewart*, upon which the reference was
ordered. In *Morss* v. *Elmendorf*, 11 Paige, 277, the principle is
suggested as broadly, and substantially in the terms and with the
limitations, as we have stated it ; and again in *Wiswall* v. *Mc-
Gowan*, Hoffm. Ch. 125, where it is ably discussed, and the au-
thorities, particularly those in New York, collated. This last
decision was reversed by the supreme court in 2 Barb. 270 ; but,
upon appeal, the case was disposed of ultimately upon other
grounds, (see 6 Selden, 465,) and the principle of *Denton* v. *Stew-
art* and *Woodcock* v. *Bennet* was soon after asserted in the su-
preme court. *Woodward* v. *Harris*, 2 Barb. 439.

The case of *Denton* v. *Stewart* is not without support from early English authorities. See *Hedges* v. *Everard*, 1 Eq. Cas. Ab. 18, pl. 7 ; *Cud* v. *Rutter*, 1 P. W. 570 ; *Wilkinson* v. *Torkington*, 2 Y. & Col. Exch. 726.

Its doctrine is fully adopted in Massachusetts : *Peabody* v. *Tarbell*, 2 Cush. 226 ; *Andrews* v. *Brown*, 3 Cush. 130 ; *Pingree* v. *Coffin*, 12 Gray, 288, 305 ; *Attorney General* v. *Deerfield River Bridge Proprietors*, 105 Mass. 1 ; and by other courts in this country : *Rees* v. *Smith*, 1 Ohio, 124 ; *Gibbs* v. *Champion*, 3 Ohio, 335 ; *Jones* v. *Shackleford*, 2 Bibb, 410 ; *Fisher* v. *Kay*, Ib. 434 ; *Slaughter* v. *Tindle*, 1 Littell, 358 ; *Rankin* v. *Maxwell*, 2 A. K. Marshall, 488 ; *Copper* v. *Wells*, Saxton, 10 ; *Berry* v. *Van Winkle*, 1 Green Ch. 269.

In England, authority to the full extent which we have maintained in this opinion has been recently conferred upon courts of chancery, or declared to belong to them, by St. 21 & 22 Vict. c. 27. This statute was rendered necessary by the doubts as to that authority, which have been entertained in consequence of the opinion of Lord Eldon as expressed in *Todd* v. *Gee*. We do not regard the statute as necessary for that purpose, except by reason of such doubts ; being satisfied that the authority belongs to the court as incident to its chancery jurisdiction, and essential to the complete exercise of that jurisdiction. The second section of the statute is as follows : " In all cases in which the court of chancery has jurisdiction to entertain an application for an injunction against a breach of any covenant, contract or agreement, or against the commission or continuance of any wrongful act, or for the specific performance of any covenant, contract or agreement, it shall be lawful for the same court, if it shall think fit, to award damages to the party injured, either in addition to or in substitution for such injunction or specific performance ; and such damages may be assessed in such manner as the court shall direct." This statute is held to apply only to cases which are of equitable cognizance in their essential character. *Durell* v. *Pritchard*, Law Rep. 1 Ch. 244.

In New York, the right of a plaintiff in a bill in equity to have damages assessed, instead of specific relief, is now held to be even

much more extensive, under the code of practice in force there. *Barlow* v. *Scott*, 24 N. Y. 40. *Genet* v. *Howland*, 45 Barb. 560.

The plaintiffs in this case base their claim upon a written mem orandum, the two parts of which, signed respectively by Mrs. Milkman and the Ordways, together with the facts and circumstances stated in the report, sufficiently establish an agreement for the occupation by her of the premises which she claims. No question is raised as to the sufficiency of the proof of the agreement under the statute of frauds. The agreement contemplates a period of eight years. The stipulation that Mrs. Milkman is "to have the store by promptly paying $200 on the first day of each month," has no force or significance unless it extends to the whole time so contemplated. Mutuality is secured by the provision that the repayment of the difference or excess of the monthly payments, over the rent, taxes and expenses, is to be postponed to the expiration of the eight years, and made conditional upon the continuance of occupation and fulfilment of the obligations on her part during that whole period.

The plaintiffs claim that the defendants Ordway held their lease from Cumston upon the trust to serve this right of occupa tion by Mrs. Milkman; and therefore that she had such an interest in their lease as to give her the right, in equity, to prevent its surrender and the consequent defeat of her right of occupation. This claim is supported by the established or admitted facts, that Mrs. Milkman was previously in the occupation of the premises as tenant at will of Cumston; that there had been negotiations between her and Cumston for a lease for eight years, and consent of Cumston that she should have it for that term at the annual rent of $1800 and taxes, with security; that she applied to the Ordways to become sureties for her; that, after some negotiations with Cumston for a lease to themselves, they made the arrangement with her as set forth in the duplicate writing relied on; that after the execution and delivery of this writing they took their lease from Cumston; that Mrs. Milkman's occupation was continued without interruption until suit brought, the only change being that from September 1864 she occupied in pursuance of and in accordance with the written memorandum between her and

the Ordways ; that this occupation was apparently with the full knowledge, assent and approval of Cumston ; and that Mrs. Milkman supposed in fact, and had reason to suppose, that the lease was taken by the Ordways in her behalf and for her benefit.

Upon this statement of her case, she had clear grounds for proceeding in equity :

1. In the alternative, set forth in the bill, that the defendants the Ordways were about to surrender their lease and thus defeat her occupancy under them ; to prevent them from so doing, and also to prevent them from ejecting her in violation of their agreement.

2. In the other alternative set forth, to wit, that the lease had already been cancelled ; to charge them with the trust alleged, and Cumston with notice of that trust, and thus compel both to preserve her interest, notwithstanding such surrender and cancellation of the lease.

Upon the first ground, the bill was defeated, in its purpose of specific relief, simply by the fact, developed in the answers and established by the testimony of the defendants, that the lease had already been surrendered three days before the bill was filed, two days before it was sworn to. Nevertheless this would not have defeated specific relief upon the second ground, but for two facts, developed by the answer of Cumston only, to wit : First, the clause against underletting ; and Second, that Cumston was ignorant of the written agreement, and supposed Mrs. Milkman to be tenant at will only, until after the agreement for cancellation.

The bill was therefore dismissed as against Cumston. But the grounds on which this was done were personal to Cumston. The Ordways did not set up either in their answer, nor were they entitled to avail themselves of either as a defence or excuse for non-performance by them. Their lease was not terminated by reason of the clause against underletting ; nor does it appear that it would have prevented the complete fulfilment of their agreement. On the contrary, the circumstances afford strong ground on which to maintain an equitable waiver of the clause in favor of the

plaintiffs. As a forfeiture, we think it must be held to have been waived. But Cumston had, without notice of the extent of Mrs. Milkman's interest, changed his situation by accepting the surrender of another unprofitable lease as consideration for the cancellation of this; and thereby acquired new rights, and established counter-equities in his own favor.

As against the Ordways, specific relief is defeated, not by any failure of the plaintiffs to establish their title to equitable consideration; not by any counter-equities set up or maintained by the Ordways; but simply by the incapacity on their part, thus developed in the course of the hearing, to comply with an order for specific relief, to which the plaintiffs would be entitled but for such incapacity.

The bill is clearly brought in good faith, seeking specific relief, with reasonable grounds to suppose that such relief was attainable by its means. The case does not show that Mrs. Milkman was aware, when the bill was brought, that the lease had been actually surrendered. She had indeed, in December, notice of some such purpose on the part of the Ordways; but on the first of February they received the monthly rent from her; so that the condition of the facts amply justifies the alternative allegations of the bill in this respect. But even if she had knowledge of the surrender, she had also reason to believe that Cumston knew of her interest in the lease, and would in equity stand chargeable for its preservation.

As to the other ground of alleged disability, namely, the clause against underletting; if that had been pleaded, which is not the case; and if it were in itself inconsistent with any decree to enforce the equitable right of Mrs. Milkman to the enjoyment of the premises during the full period of eight years, which is at least questionable; yet it would be no defence for the Ordways. They might still be enjoined from ejecting her, and from defeating her rights by a surrender of their lease. If not waived by Cumston, the clause has never been enforced by him; and it is not for the Ordways to set it up for their own advantage, to escape from their agreement with Mrs. Milkman. *Blake* v. *Sanderson*, 1 Gray, 332. *Shattuck* v. *Lovejoy*, 8 Gray, 204.

Even if the case had been otherwise in this respect, and the right of occupation of Mrs. Milkman had been terminated by means of this clause alone, enforced against both her and the Ordways by Cumston before reaching a decree, and her specific relief had been thus wholly defeated, still, as she had no notice of this defeat in the title and capacity of the Ordways, when she commenced her suit, and her bill in equity was brought in good faith, in the opinion of the majority of the court it might be maintained for the purpose of awarding compensation.

In any view of the facts, therefore, the decree for compensation was rightly made.

The court are all satisfied that the conclusions of the justice who heard the case, in regard to the alleged contemporaneous oral agreements, were correct. *Decree affirmed.*