## The Rector, Wardens and Vestrymen of the Church of the Holy Communion

*v.*

## The Paterson Extension Railroad Company and the New York, Susquehanna and Western Railroad Company.

A railroad having been built so near to the wall of a church as to injure its foundation, the railroad company agreed to repair it by putting under it a concrete sub-foundation, but it performed the work in an insufficient and injurious manner, and afterwards, upon demand, refused to do anything further in compliance with its agreement. Upon such refusal the church authorities repaired the church, making its walls secure, and then filed a bill against the

railroad company, which prays that that company be decreed to specifically perform its agreement by reimbursing the church for the money it had expended. The bill also, among other things, prayed that the defendant be decreed to pay a sum equal to the amount of revenue which the church lost while it was closed for repairs, and a proper sum as compensation for a strip of the church's land which the defendant occupied with its railroad.—*Held*, that the complainant's demands were mere naked claims for damages, which could not be enforced in a court of equity.

On bill and demurrers.

The bill alleges that the complainant was seized of a plot of ground in Paterson, situate upon the southeast corner formed by the intersection of Pearl and Carrol streets, fronting about sixty-two feet on Carrol street and one hundred and twenty-five feet on Pearl street, upon which, in the year 1870, it had erected a church, built with stone.

In April, 1881, the Paterson Extension Railroad Company, to whose rights, duties and liabilities the New York, Susquehanna and Western Railroad Company has succeeded, laid its route so that it included a strip from the southerly side of the complainant's land, running longitudinally with, and close to, the church edifice, and thereupon, without condemning or paying for the complainant's property, entered upon it and excavated a railroad cut, adjoining the church building, more than eight feet deep, and, although having license to do so, failed to preserve the church wall from injury, or to support it with a proper foundation, as the statute (*Rev. p. 809*) requires.

By the cut, the natural support of the south wall of the church was weakened. In consequence thereof, and of the vibrations caused by the operation of the defendants' railroad, the building was injured. Thereupon the complainant employed an architect and engineer, who, after examination, estimated the probable expense of repairing the church and making secure its foundation, and then requested the Paterson Extension Railroad Company to pay to it the sum thus estimated.

The railroad company refused to comply with this request, but later, in the year 1881 or 1882, to use the language of the bill—

"In consideration of the injuries done your orator in the premises, offered and undertook and agreed to and with your orator that they, the said defendants, would thoroughly repair the damage done to said church building and its foundation wall, and that they would make the said church building and its foundation wall as firm, secure and stable as they were before the making of such excavations, by putting under them a solid and sufficient concrete subfoundation, and, in addition, would give to your orator one thousand dollars in cash towards the cost of repairing and redecorating the interior of its said church building, which said agreement was made orally by and between said defendants and your orator, and was not reduced to writing."

After this agreement was entered into the railroad company built a retaining wall between the church and the railroad, and pretended to put a solid concrete sub-foundation under the church wall, and then, representing that the work had been done as agreed, paid the complainant $1,000, which the complainant accepted in the belief that the representations concerning the work were true. Shortly after this payment the south wall of the church began to sink; cracks appeared; the wall drew away from the roof; portions of the church ceiling fell, and the floor on the side adjoining the railroad sank. The complainant again employed an engineer, and upon his reporting that the church was not safe for use for the purposes for which it was designed, notified the defendants to proceed to repair it, and to put it in the firm, safe and secure condition that it was in before the railroad cut was made. The defendants refused to do so. Thereupon the complainant caused plans and specifications of the work necessary to be done to be made and submitted to the defendants for suggestions, alterations or amendments and their approval, but the defendants would not have anything to do with the plans or with the proposed work. The complainant then caused the work to be done at a cost of about $9,000. As the work proceeded, the discovery was made that the defendants had not only failed to carry out their contract to build a solid concrete sub-foundation, but had actually damaged the church wall by the work which they did do.

After the complainant completed the work of restoring the church, it requested the defendants to pay the cost, but the defendants refused to do so.

FEBRUARY TERM, 1890. 375

Church of the Holy Communion v. Paterson Extension R. R. Co.

The complainant was deprived of the use of its church for six months from the 10th of June, 1887, and during that time was obliged to hire places for its congregation to meet in, and to go to the expense of constantly moving its furniture and books.

It was a free church, supported by the voluntary contributions of its congregation. When the building was closed many members of its congregation went to other churches, and in consequence its revenues were reduced.

The defendants have never paid for the land which they took.

The bill prays that an account may be taken of the moneys necessarily expended in carrying out the work agreed to be done by the defendants and in repairing the church, and also of the loss of revenue to the complainant, and that the value of the land taken by the defendants, and the damages occasioned by the taking thereof, may be ascertained, and that the defendants may, to use the words of the bill—

"Be decreed to specifically perform their said agreement by reimbursing your orator for all such sums of money by it laid out and expended in and about the carrying out of said agreement of said defendants, and for the necessary repairs and expenses incident upon and resulting from the non-performance of their said agreement by the said defendants, and that the said defendants may also be decreed to pay over to your orator such sum of money as may be ascertained to equal the losses from loss of revenue or other causes resulting from the building and operating of said railroad by the defendants, and that said defendants may also be decreed to pay over to your orator such sum of money as shall be ascertained to be the value of the said strip of its land and premises so appropriated, occupied and held by said defendants, and the damages by reason of the taking thereof, together with interest on all sums found due to your orator."

The defendants separately demur to this bill.

The Paterson Extension Railroad Company demurs to the whole bill upon two grounds—first, for want of equity, and, second, because the bill is multifarious, in connecting matters which have no connection with each other and in joining matters in which the demurrant has no concern.

The New York, Susquehanna and Western Railroad Company demurs—first, as to that part of the bill which seeks reimbursement of the moneys expended in repairing and making

secure the church, upon two grounds: (*a*) for want of equity, and (*b*) because it appears that the cause of suit did not accrue within six years; and, second, as to that part of the bill which seeks compensation for the value of the land taken, and damages by the taking, with interest, for losses in the church revenue, and for damages caused by the operation of the railroad, for want of equity.

*Mr. John W. Taylor* and *Mr. John W. Griggs*, for the demurrants.

*Mr. Joseph D. Bedle, contra.*

THE CHANCELLOR.

The complainant seeks nothing but compensation and damages. The bill is presented in the guise of a bill for specific performance, nominating the recovery it seeks, substituted performance.

It presents a case in which specific performance was, by the complainant's own act, rendered impossible before the filing of the bill, and it couples with claims that grew out of the nonperformance of the contract, to which it refers, demands for the value of lands taken and for damages occasioned by the operation of a railroad which it does not pretend were connected with the contract which was not performed. For each matter thus put in suit, the complainant, if it may have redress at all, may have it at law. There it may maintain an action for the damages caused by the breach of the contract, and trespass and ejectment will secure compensation for the land unwarrantably entered upon and taken possession of. There is no allegation that the railroad was not operated with care and skill. It has been decided in this state that damages incidental to the proper operation of a railroad, authorized by law, cannot be recovered. *Beseman* v. *Pennsylvania Railroad Co., 21 Vr. 235; S. C. on error, 23 Vr. 221.*

Courts of equity have given compensation or damages as relief ancillary to specific performance, where the main relief, having

been sought in good faith, cannot be afforded. In so doing, they have been actuated by the desire to save multiplicity of suits, or to give redress to which the complainant is justly entitled, but which he cannot have, or adequately have, at law. For instance, where in a suit for specific performance the defendant, pending the suit, has deprived himself of the power to specifically comply with the terms of the contract, the suit has been retained and compensation in damages has been awarded to the complainant rather than send him to another suit at law. *Morss* v. *Elmendorf, 11 Paige 277; Milkman* v. *Ordway, 106 Mass. 232.* And the same course has been pursued where the defendant, without the knowledge of the complainant, has deprived himself of power to perform the contract prior to the filing of the bill. *Morss* v. *Elmendorf, supra; Milkman* v. *Ordway, supra.* And even where the defendant never had the power to comply with the terms of the contract, if the complainant, at the time of filing his bill, in good faith supposed that he could have specific performance. *Morss* v. *Elmendorf, supra.* And where the contract itself was of such a character that the court would not specifically enforce it, and the complainant was in such a situation that, while justly entitled to relief, he could not adequately have it at law. *Copper* v. *Wells, Sax. 10; Berry* v. *Van Winkle's Exrs., 1 Gr. Ch. 269; Phillips* v. *Thompson, 1 Johns. Ch. 131; Parkhurst* v. *Van Cortlandt, 1 Johns. Ch. 273.*

But it has also been held that where the complainant, having adequate redress at law, at the time he files his bill, knows that the defendant cannot specifically perform the contract, his suit becomes purposely a mere naked claim for damages, under the guise of a proceeding to secure specific performance, and will not lie. *Hatch* v. *Cobb, 4 Johns. Ch. 559; Kempshall* v. *Stone, 5 Johns. Ch. 193; Morss* v. *Elmendorf, supra.*

In *Peeler* v. *Levy, 11 C. E. Gr. 330,* in this court, the complainant had contracted with the defendant for the exchange of property which belonged to the latter's wife, knowing, at the time, that the title was in the wife. The wife separated from her husband because of his ill-treatment of her, and refused to consent to the exchange. Upon a bill being filed for specific

performance, the vice-chancellor (Van Fleet) declared it to be unconscionable for one man to take the promise of another to do a particular thing which the promisee knows at the time the promise is made that the promisor cannot perform, except by the consent of a third person, and then, when consent and concurrence is refused by the third person in good faith, to demand a strict and literal fulfillment of the promise, and that therefore the complainant was not entitled to assistance from a court of equity, and then added, upon the authority of *Hatch* v. *Cobb*, *Kempshall* v. *Stone* and *Morss* v. *Elmendorf*, that a court of equity will not take jurisdiction of a naked claim for damages, even when it is made under the guise of a suit for specific performance.

In *Milkman* v. *Ordway*, above cited, it was adjudged that when it is determined that the complainant has the right to equitable relief, the court's jurisdiction is established, and then damages may be awarded as an alternative if the defendant shall fail to do, or procure to be done, that which strict equity demands, or the court may proceed directly to award damages or compensation. This rule, however, is qualified, in the court's opinion, by this language: "The peculiar province of a court of equity is to adapt its remedies to the circumstances of each case, as developed by the trial. It is acting within that province when it administers a remedy in damages merely in favor of a party who fails of other equitable relief to which he is entitled *without fault on his own part.*"

This view of the court's province, which is inconsistent with the doctrine of *Hatch* v. *Cobb*, and the cases which follow that decision, has the approval of Vice-Chancellor Van Fleet, in *Ludlum* v. *Buckingham, 8 Stew. Eq. 71, 83*, as being "founded in good sense and supported by sound logic."

*Ludlum* v. *Buckingham* was reviewed by the court of errors and appeals (*12 Stew. Eq. 563*), but that court did not determine or discuss the question as to the jurisdiction of this court to award damages, but, expressly disavowing the necessity of so doing, affirmed the decision of the vice-chancellor upon the ground that, if damages or compensation could be given it would

be by way of substituted performance, which would not be decreed in favor of one whose conduct was not free from fraud and inequity, and that the conduct of the complainant, in that case, was of such a character as to forfeit his right to equitable relief.

In the case before me, the complainant, by its own act, in repairing the church and securing its foundation, has deprived the defendants of the ability to specifically perform their contract. While it had the right to sue for specific performance, it deliberately put it out of the power of the defendants to perform the contract, and then, having, of course, full knowledge of what it had done, applied to this court for what it terms substituted performance. The present application to this court is alike objectionable under either the doctrine of *Hatch* v. *Cobb* or the doctrine of *Milkman* v. *Ordway.* The complainant's action, in itself doing that which would be performance of the contract if done by the defendant, when the doors of this court stood open to it, cannot be regarded otherwise than as an abandonment of its right to come into equity. The claim to damages now is not ancillary to an equitable right, which, without the complainant's fault, is unavailable to it, but it is the principal relief, made so by the complainant's own act, and it must be sought in the appropriate tribunal.

The claim for compensation for the land taken by the defendant, which stands independently of the contract, is not supported by, or subordinate to, any matter cognizable in equity.

It is not necessary to determine whether the other grounds of demurrer are sufficient. I am fully satisfied that the bill fails to present a case for equitable relief, and upon that ground alone will sustain the demurrers.