## J. H. WOOD *vs.* B. F. DILLINGHAM.

### APPEAL FROM THE CHANCELLOR.

### JULY TERM, 1886.

### JUDD, C. J.; McCULLY and PRESTON, JJ.

Plaintiff agreed to sell to defendant the "Nuuanu Dairy property, containing an area of 650 acres, more or less;" after defendant took possession, he found that the area was only 258 acres, and claimed a proportionate reduction on the purchase price, which plaintiff refused to allow; plaintiff files a bill for specific performance.

Held, that when the purchaser is willing to take a less quantity of land than the contract calls for, he is entitled to a *pro rata* reduction in price, and the words "more or less" will not cover such a deficiency as exists in this case; but the defendant, having sold the property soon after his purchase of it, to a corporation of which he was President, at a large advance on the price agreed to be paid by him to plaintiff, held, affirming the decree of the Chancellor, that defendant may elect whether specific performance of the contract shall be decreed without compensation, or whether the sale shall be annulled and plaintiff pay defendant the enhanced market value of the property by reason of the permanent improvements placed thereon by defendant, less rent.

### OPINION OF THE COURT, BY PRESTON, J.

THIS is a suit for the specific performance of an agreement for the purchase of the property known as Wood's Dairy.

This case was heard by the Chancellor on March 16th, 17th, 24th, and April 1st of the present year, who rendered the following decision:

### DECISION OF THE CHANCELLOR, BELOW.

This is a bill in equity to compel the specific performance of a contract for the sale of land.

The substance of the bill is as follows : That on the 31st of December, 1883, the plaintiff agreed in writing with defendant to sell, and defendant agreed to purchase the Nuuanu Dairy property situate in Nuuanu Valley, described in certain conveyances which are set out in the bill; that on the execution and delivery of the agreement, defendant paid plaintiff the sum of $1,000 as part of the purchase money and entered into possession of the premises, and he and those claiming under him have ever since and now have possession of the same; that in accordance with this agreement, plaintiff tendered defendant a deed of the premises on the 1st of July, 1884, but owing to a defect in the plaintiff's title to a portion of the premises, a release and quit claim was necessary to be obtained from the Hawaiian Government which was not obtained till the 28th of August, 1885, but defendant assented to the delay, declining to accept the deed until the complainant's title had thus been perfected ; that on the 25th of November, 1885, plaintiff tendered defendant a good and sufficient deed of the premises complying with the terms of the agreement, and is now willing to give defendant such deed upon his paying the part of the purchase money, amounting to $7,000, and interest due amounting to $2,584 60, and securing the balance of the purchase money, $10,000, as provided in the agreement; that defendant refused to accept the tender of the deed made on the 25th of November, 1885, and now refuses to accept it or to pay the purchase money, or to comply with plaintiff's request to execute his agreement. The bill prays that defendant be compelled to specifically perform his agreement, etc.

The answer admits that defendant entered into the agreement of the 31st of December, 1883, to purchase the Nuuanu Dairy property, including real estate and buildings, but denies that the contract contains any reference to the deeds of Vincent and others which are set out in the bill and says that the contract calls for a conveyance of six hundred and fifty acres of land, more or less, and contains no other description by which said area could be limited ; that the purchase price named in the contract

was determined by the acreage therein set forth; that plaintiff represented to defendant that the premises contained at least six hundred and fifty acres, and led defendant to believe it contained more ; that during the negotiations the parties figured upon the value per acre, and plaintiff represented the area to be six hundred and fifty acres ; that since the date of the contract the defendant has had a survey made of the premises and avers that they contain only 258 acres; the plaintiff has been in possession of the premises since March 18, 1861, and well knew, or had the means of knowing, the actual area of the premises; that the deeds of the plaintiff, named in the conveyance tendered, call for only 301 16-100 acres, of which a portion had been sold by plaintiff; that defendant was not acquainted with the area or extent of the premises and signed the contract relying on the representations of the plaintiff that they contained 650 acres, more or less, and that said false representations were fraudulently or mistakenly made by plaintiff. The answer admits the payment of $1,000 on account of purchase money and that defendant has been in possession since January 1, 1884. The allegation in regard to delay to obtain a quit claim from the Hawaiian Government, and defandant's assent to the delay, is admitted. The tender of a good and sufficient deed on November 25, 1885, or at any time, is denied and it is averred that the deed tendered did not include more than 258 acres, and plaintiff has not offered to make said acreage of 650 acres. That defendant bought the premises for the purpose of carrying on a dairy on the same ; That it was of great importance to defendant to obtain the number of acres mentioned in the contract to afford sufficient pasturage to keep up respondent's business, all of which was well known to complainant when he signed the contract; that defendant, relying upon the false representation that the premises contained 650 acres, has expended the sum of $9,461 69 on buildings and improvements on the premises, and has built one barn more than was required for all the cattle that 258 acres of land could support, and has had to obtain other land to make up said area ; that defendant is willing to carry out his contract upon plaintiff's tendering him a deed of 650 acres of land, or thereabouts, and is now willing to take all of said premises which plaintiff is able to convey, upon a pro-

portionate reduction being made for deficiency in area below the amount called for by said contract, and to pay the balance in cash. All other allegations are denied. The answer prays that the bill be dismissed with costs upon defendant paying such sum as may be found due after allowing a proportionate deduction from the purchase price for the said deficiency in area.

### By the Court.

The evidence taken is voluminous and only such parts of it as are essential will appear in the opinion. The case is a difficult one, presenting many complications, not only upon the facts, but as regards the relief which would be equitable to both the parties.

It is clearly established by the evidence that the plaintiff, though he had owned the premises since March, 1861, had not had it surveyed, nor did he know its area, it having been described to him by his vendor, C. W. Vincent, as being a mile square, and he so represented it to defendant. It is an estate known in this community and commonly called "John Wood's place," or "the Nuuanu Dairy." It is in sight from the road leading to the Pali and its boundaries are certain. These were pointed out by plaintiff to defendant, who visited the premises frequently. It is bounded on one side by the main road, on the opposite side by the top of the ridge, on the side towards town by Queen Emma's place, on the upper side by the Luakaha premises. Mr. Gay, who surveyed the land for defendant, says that it is about three hundred feet short of a mile long on the road and about the same length on the ridge, and is so situated as to deceive an observer as to its area, looking much larger than it really is ; that he could form no accurate idea of its size without measuring it, and that it might well appear to be a mile square, or 640 acres.

I think it is well established that Mr. Wood supposed it to be a mile square and that he made no fraudulent misrepresentations as to its area to the defendant.

The description in the contract of the property to be sold is as follows: "The Nuuanu Dairy property, including real estate and buildings ; said real estate contains an area of 650 acres, more or

less." The price was $18,000, $1,000 in cash and the balance in deferred payments.

The question is whether defendant is entitled to a conveyance of all the land that vendor can give (258 acres) with an abatement of the purchase money for so much as the quantity falls short of that mentioned in the contract. Numerous authorities, both English and American, have been cited by counsel on both sides.

Chancellor Kent, in his Commentaries 4, p. 466 and 467, says : " The mention of quantity of acres after a certain description of the subject by metes and bounds, or by other known specifications, is but a matter of description, and does not amount to any covenant or afford ground for breach of any of the usual covenants, though the quantity of acres should fall short of the given amount. Whenever it appears by definite boundaries or by words of qualification as 'more or less' or as 'containing by estimation,' or the like, that the statement of the quantity of acres in the deed is mere matter of description, and not of the essence of the contract, the buyer takes the risk of the quantity, if there be no admixture of fraud in the case."

·One of the more recent cases bearing upon this question is that of *Noble vs. Googins*, 99 Mass., 231 (1868), where the previous cases are largely cited and commented upon. This learned Court per Gray, J., says: " It has since been declared by a great weight of authority, in accordance, we think, with the soundest reason, that in an agreement for the sale and purchase of land for an entire sum either a description of the land by its boundaries, or the insertion of the words 'more or less,' or equivalent words, will control a statement of the quantity of the land or of the length of one of its boundary lines, so that neither party will be entitled to relief on account of deficiency or surplus, *unless in case of so great a difference as will naturally raise the presumption of fraud or gross mistake in the very essence of the contract.*"

The case before the Court was an action of contract for balance of price for the purchase of a wharf lot in Boston. The defendant claimed an abatement from the stipulated price for a deficiency in the quantity of land. The land was described as a wharf lot on Border street, bounded on one side by the ship-yard of Paul

Curtis, and on the other side by that of Donald McKay, and as measuring about 220 feet on Border street, more or less. The land actually measured only 170 feet on Border street. The case is stronger for the defendant than the one now before me, for, as the Court say, the land was stated to be bounded on either side by ship-yards, in the occupation of persons named, the limits of which would apparently be manifest upon looking at the premises.

The Massachusetts Court refer to the case of *Hill vs. Buckley,* 17 Vesey, 394 (1811), in which Sir William Grant, M. R., held that the general rule of specific performance was that the purchaser shall have what the vendor can give, with an abatement of the purchase money for so much as the quantity falls short of the representation. This case is relied on by the counsel for defendant in the case at bar. The contract of sale called for the "Kestle Woods, including the Gulberry Marsh, containing 217 acres and 10 perches." It fell short by about 26 acres. No deception was intended, and the Master of the Rolls says: "When a representation has been made as to the quantity, though innocently, I apprehend the right of the purchaser to be, to have what the vendor can give, with an abatement out of the purchase money for as much as the quantity falls short of the representation. That is the rule generally, as though the land is neither bought nor sold professedly by the acre; the presumption is that in fixing the price regard was had on both sides to the quantity which both suppose the estate to consist of. The demand of the vendor and the offer of the purchaser are supposed to be influenced in an equal degree by the quantity which both believe to be the subject of their bargain, therefore a rateable abatement of price will probably leave both in nearly the same relation in which they would have stood if the true quantity had been originally known." As the purchaser had got the quantity of wood which he bargained for, the Court awarded an abatement for the value of twenty-six acres of land, deducting the value of the wood on it.

The Court, in the Massachusetts case (99 Mass.), thought that the authority of this case was shaken by a later case (*Winch vs. Winchester,* 1 Ves. and B., 375), from the same Judge, in which he-

declined to order an abatement in the purchase price for a deficiency of five or six acres, where the sale was of "41 acres more or less," and the vendor did not know the true quantity, and made no other representation what it was.

It seems to me that the amount of the deficiency in each case has a very great influence upon the Court in settling the question as to abatement.

In *Belknap vs. Sealey*, 14 N. Y., the Court of Appeals held that a Court of Equity will rescind an executory contract, on the application of the vendee, for the purchase of land on the ground of mistake in quantity, notwithstanding the premises are described by metes and bounds, and the terms "more or less" added after a statement of the quantity, where the mistake on the part of the purchaser was caused by the misrepresentation of the vendor, although not fraudulently made, and when the mistake so essentially affected the value of the premises "that the contract would not have been made if it had existed." The land was described by metes and bounds, and as containing eight acres "more or less." The actual quantity was four acres. An abatement in price was not claimed, but the vendee asked to have the contract rescinded. The Court say: "A deed which describes the land, and states the number of acres, although with the words 'more or less,' clearly imports that there is not a great deficiency or excess. If the deficiency is one-half, the instrument carries on its face a gross misrepresentation." The Court based its opinion on the ground that the contract was still executory, and that equity ought to relieve against a contract where the mistake is so material as to go to the foundation of the agreement.

Judge Story's opinion in *Stebbins vs. Eddy*, 4 Mason, 414 (1827), is much quoted in subsequent cases, and is relied upon by the plaintiff in our case. He says: "There is much good sense in holding that the words 'more or less,' or other equivalent words used in contracts or conveyances of this sort should be construed to qualify the representation of quantity in such a manner that, if made in good faith, neither party should be entitled to any relief on account of a deficiency or surplus; nor am I prepared to admit that the fact that the sale is not in gross, but for a specific sum by the acre, ought necessarily to create a difference

in the application of the principle. I do not say that cases may not occur of such an extreme deficiency as to call for relief, but they must be such as would naturally raise the presumption of fraud, imposition or mistake in the very essence of the contract."

I have examined the following cases cited by counsel on both sides: *Belden vs. Seymour*, 8 Conn., 19; *Morris vs. Emmett*, 9 Paige, 167; *Powell vs. Clark*, 5 Mass., 355; *Jackson vs. Barringer*, 15 Johns., 470; *Perkins vs. Webster*, 2 N. H., 287; *Marvin vs. Bennett*, 26 Wend., 168; *Weart vs. Rose*, 16 N. J. Eq., 291; *Gilman vs. Riopelle*, 18 Mich., 164; *Mann vs. Pearson*, 2 Johns., 36; *Jackson vs. Moore*, 6 Cowen, 706; *Stanley vs. Green*, 12 Cal., 164; *Cabot vs. Winson*, 1 Allen, 546; *Couse vs. Boyles*, 4 N. J. Eq., 212; *Miller vs. Chetwood*, 2 N. J. Eq., 199; *Cross vs. Eglin*, 2 B. & Ald., 106; *Whittemore vs. Whittemore*, 8 L. R. Eq. Cas., 603; *Davis vs. Shepherd*, 1 L. R., Ch. App. 310; *Milkman vs. Ordway*, 106 Mass., 232, and find nothing especially varying from the above cases.

To apply the principles of law to the facts as I find them:

The contract was for the sale of the " ' Nuuanu Dairy ' property, including real estate and buildings, said real estate containing an area of 650 acres, more or less.". The fact that it is not described by metes and bounds is not decisive of the case in favor of the defendant.

In *Haley vs. Amestoy*, 44 Cal., 132, the land was described by name—the Rancho de San Vincent, and the Court held it was well described thus, and the particular description by measurement and boundaries did not restrict it. As we have seen in the case of the 14 N. Y. and 99 Mass., the fact that the lands were definitely described by metes and bounds, or other certain description, is not necessarily fatal to the relief of the purchaser, nor is their absence of itself sufficient to make the vendor liable for the full amount in case of shortage. The presence of the qualifying words " more or less," will not, of themselves, relieve the contract from the presumption of mistake in the essence of the contract, where the deficiency is so great as to raise the presumption.

Was the amount of land in the Nuuanu Dairy property of the essence of the contract? I think it was. The amount of acreage

was mentioned in the correspondence between the parties. (See letter of Dillingham to Wood, 28 December, 1883) and the capacity of the place for a dairy was the subject of discussion between them. The discrepancy between 650 and 258 acres is so great as to raise a mistake in the essence of the contract. I think it is very evident that both parties supposed the property to have been about the area of 650 acres.

If the simple rescission of the contract of the sale would place the parties where they were when negotiations were concluded, I would not hesitate to annul the contract, on the ground of mutual and gross mistake.

But immediately on the signing of the agreement, Dillingham took possession of the premises and put the cows of the Woodlawn Dairy upon it and commenced the erection of extensive barns upon the premises. He did this before he had the premises surveyed. Soon after the Surveyor, James Gay, commenced his investigations, and in April or May became convinced of a considerable shortage from the supposed area. This he communicated to Mr. Wood, and presumably to Mr. Dillingham, though there is no exact evidence as to when he did so. On July 5, 1884, Mr. Dillingham made a proposition to the Woodlawn Dairy and Stock Company, a corporation engaged in dairy business, in which Mr. Dillingham was the largest stockholder, to sell to it the Nuuanu Dairy, or Wood Ranch, for $57,500, with the improvements made by him, and certain live stock, and future improvements, to cost in all $15,000. This was accepted by the Company, as appears by the minutes of that date. Whether Mr. Dillingham was then aware of the shortage in area or not does not appear exactly. Mr. Wood says that about that date he tendered Mr. Dillingham a deed of the property, which Mr. Dillingham declined on the ground of the deficiency in area, and claimed a proportionate reduction in the purchase money. The minutes of the Woodlawn Dairy Company recording apparently a statement of Mr. Dillingham, read : " The removal of the stock from the dairy at Punahou to the new one at Nuuanu Valley, at the Wood Ranch, has; upon a trial of six months, proved a success. The cost of feeding stock has lessened, etc." And on September 14, 1884, the transfer was made by an executory

agreement of sale, in which, though the acreage is stated to be 258 acres, the original price as agreed upon was not thereby reduced, except that Mr. Dillingham says his expenditure for live stock and improvements which he passed over to the company amount to about $22,000, which would reduce the purchase price of the premises to the Woodlawn Dairy Company to about $35,500. I am convinced by Mr. A. H. Smith's testimony, as well as by the acts of Mr. Dillingham in building the barns immediately after January 1, 1884, and putting the cows of the Woodlawn Dairy there before he had procured a title to the place, that he intended the purchase in the first place to be for the Woodlawn Dairy. He has thus put it out of his power to reinstate the vendor in the position he was in when the negotiations were concluded.

The defendant contends that as the additional land to make up 650 acres cannot be furnished, he is entitled to have an abatement in the contract price of $18,000, which for 650 acres would bring the price of one about $28, and Mr. Dillingham having only received 258 acres, at $28 he would have to pay something over $7,000 for the bare land, and an additional sum of say $1,500 to $2,000, for the houses and improvements that stood on the land when he bought it, equal in all to about $9,000, or one-half the price he originally agreed to pay for it.

I think it would be harsh and decidedly inequitable to make Mr. Wood sell his land for half what he expected to get for it and what he valued it at and what, for all that appears, it is reasonably worth.

The case of *The Earl of Durham vs. Legard* is well in point here. This was a case where A agreed to sell B an estate which was supposed by both parties, and was stated in the agreement, to contain 21,750 acres, but in fact contained only 11,814 acres, and it was held by Sir John Romilly M. R. upon a bill filed by the purchaser, that he was not entitled to specific performance of the contract with compensation. In the case, said His Honor, of *Hill vs. Buckley*, 17 Vesey, 394, which is usually cited upon these occasions, Sir William Grant laid it down that " where there is less land than was agreed to be sold, the ordinary mode of settling it is to ascertain the quantity and take it rate-

ably ; if that were done here, the plaintiff would get an estate which he had intended to buy for £66,000 for about £33,000. If that principle were to be followed in the present case it is clear I should be doing great injustice. I am of opinion that this is a case simply of mistake, and that the purchaser is not entitled to any compensation. The plaintiff must elect whether he will perform the contract without compensation or have the bill dismissed." 34 Law Journal (Ch.) N. S., 589. We have not this report, but I find the case cited in Leading Cases in Equity, Vol. II. Pt. II., 4th Am. ed. *550, *551.

I think the case before me is no different for the reason that the vendor and not the purchaser seeks specific performance, for the purchaser in his answer, which might have been a cross bill, asks just this relief.

In the Earl of Durham's case the land had in all probability not been taken possession of by the purchaser nor improved by him, so a dismissal of the bill, if the purchaser so elected, would annul the contract and leave the parties where they stood if the true quantity had been known. As I have said before, our case is complicated by the improvements put on the premises by the defendant and by its sale to the Woodlawn Dairy Company. It would be inequitable to compel Mr. Wood to take his land back and pay the full amount laid out by Mr. Dillingham on improvements for which Mr. Wood has no use and which were erected for the special use to which the premises have been devoted by defendant during the past two years. It is not at all probable that these impiovements enhance the market value of the place to anywhere near their cost. On the other hand, to rescind the sale, defendant to take off his improvements, would be unjust to defendant and entail a great and useless waste of property. Each case of this character must be decided according to its own peculiar circumstances.

After much reflection I am of the opinion that the defendant should be allowed to *elect* whether specific performance of the contract shall be decreed without compensation, since he has sold the premises for double that he contracted to pay for it, or whether specific performance shall be refused and the agreement of sale annulled, the plaintiff to pay defendant the amount of

the enhanced market value of the premises by reason of the permanent improvements placed thereon by defendant, less rent, to ascertaih which a reference may be had to a master.

On the question of the power of the Court to award damages where specific performance of the contract is not decreed, I refer to *Milkman vs. Ordway*, 106 Mass., 232.

Each party is to pay his own costs. Costs of Court to be divided. Decree accordingly.

Honolulu, May 1, 1886.

From this decision the defendant appealed, which appeal was heard on the 12th inst.

*S. B. Dole*, for the appellant.

There is an important variance between the allegations in the bill and the proof. The defendant was told there was 650 acres; he bought on the faith of the representation; he required the land to enlarge business. What he could get for it is not the question; he bought 650 acres and should not pay the full price for less than one-half; he improved the property, and at the time of the discovery of the deficiency he could not withdraw; he owned seven-eighths of the Woodlawn Dairy stock, and the capital was increased from $42,000 to $100,-000; he had put improvements, cattle etc., upon the land to the amount of $22,600; by putting up the capital, the stock was depreciated to $75. The plaintiff is responsible to make up deficiency. Deliberate fraud is not charged, but a willful reluctance to ascertain quantity ; he had deeds in his possession for over twenty years, and could have ascertained the area if he had looked at them. It is a general principle that the grantor is responsible for deficiency. The case of *Earl of Durham vs. Legard* is contrary to the authorities and should not be acted upon here. The modern English decisions are against the general principle.

*W. A. Kinney*, for the complainant.

The defendant has the advantage of the plaintiff; he asks for affirmative relief as if he were plaintiff. Technically, this is an executory contract ; practically, it is executed.

The case is, what relief is appropriate. If fraud, the remedy

is positive. It is a case of mutual mistake; the defendant is to be recouped what he has actually suffered.

Constructive fraud is raised here, but not below. It is said plaintiff should have discovered area from perusing title deeds. The deeds were handed to defendant's solicitor to prepare agree‐ ment; he might have ascertained area. What damage has de‐ fendant sustained ? Shows he has lost nothing; he sold the pro‐ perty according to the exact measurement for more than the con‐ tract price. He has settled the value himself. *Earl of Durham vs. Legard* is precisely in point.

*W. A. Whiting* on same side: The Corporation issued the 100,000 shares, not defendant. $57,500 worth was issued for the property, including improvements and stock; $35,500 was paid to the defendant for this land : he has made money out of it.

*Mr. Dole* in reply : The purchase by the Corporation has nothing to do with the case; the defendant expected 650 acres, and it would be unjust to compel him to take less than one-half for the full price. Abundant authorities to show that purchaser should only pay *pro rata;* no one except plaintiff should be punished for his looseness : he should only be paid for what he receives. The Woodlawn Dairy interests are not to be sacrificed here.

### BY THE FULL COURT.

This case is complicated by the dealings of the defendant with the land in question.

The material facts of the case are substantially stated in the opinion of the Chancellor, and need not be referred to, except so far as it may be necessary to allude to them in dealing with the arguments of counsel. It is well established that in cases of this nature, when the purchaser is willing to take, and insists upon taking, a smaller quantity of land than the contract calls for, he is entitled to a reduction *pro rata*, whether the land is sold by the acre or not, and that the words "more or less" will not cover such a deficiency as exists in this case; and in these respects the arguments of counsel for the defendant are justified. The learned Chancellor did not dispute the general law, but held that the pe‐ culiar circumstances of this case rendered it inapplicable. Counsel for the defendant contends that the complainant is responsible

for the deficiency because of his willful reluctance to look at the title deeds, which he had in his possession for twenty years, without ascertaining the quantity of land.

We think the complainant's testimony entirely removes this objection; there can be no doubt he always understood the land contained a square mile, and no person from a mere inspection of those deeds could ascertain the extent of the land. If a person could, by such an inspection of the title deeds, ascertain the extent of the land, it may be fairly argued that the defendant had constructive notice of the extent, as the deeds were placed in the hands of his solicitor to prepare the agreement for sale.

It is also contended that the decree made by the Chancellor cannot be carried out, as it would prejudice the Woodlawn Dairy Company who are in possession. This renders it necessary that the Court should consider the transactions between defendant and such company. The answer of the defendant does not disclose the fact that the defendant had sold the property to the Woodlawn Dairy Company, and such fact only came out during the hearing. In fact, the defendant by his answer claims relief on the ground amongst others that he had expended $9,000 in erecting barns and permanent improvements on the land, altogether concealing from the Court the fact that he had been already paid for such improvements by the Company. This cannot improve the position of the defendant in a Court of equity.

The transaction between the defendant and the Company appears to be this; the defendant was and is President of the Company, and agreed with the complainant to purchase the property in his own name, undoubtedly intending to transfer it to the Company, if it should be found suitable for their business, and almost immediately let the Company into possession, transferring cattle from Punahou and placing other cattle purchased from Wood there. He also erected the barns and made other improvements.

On the first of July, 1884, at a meeting of the Company, called for the purpose, it was resolved that the capital of the Company should be increased from $12,500 to $100,000 and shares were issued accordingly.

The minutes of the meeting are as follows: "The object of

calling this meeting is to get the views of the stockholders for increasing the property of the company and also for increasing the stock to pay for the same. The removal of the stock from the dairy at Punahou to the new one in Nuuanu Valley at the Wood ranch has upon the trial of six months proved a success. The cost of feeding the stock has been lessened. Four new barns have been built capable of holding, 208, or 52 head each; other improvements have been made; water laid on, etc. Still more improvements are to be made soon, such as new fences, dwelling houses etc., the cost of which will amount to $15,000."

This statement we understand was made by the defendant.

"On motion of Mr. Dole it was moved and carried that the property *i. e.* the land of Nuuanu Dairy, the improvements and stock offered to the Company for $57,500 by B. F. Dillingham, be accepted, and stock be issued to pay for it, and that the capital stock be raised to $100,000, and that an equivalent amount of new stock be issued." On this showing the defendant would obtain $42,500 for the property in question.

On the 1st September following, the defendant, having in the meantime discovered the shortage, sold the property to the Company, according to its proper acreage, agreeing to put more improvements upon the land to make up for the deficiency, and, according to the statement put in by him, he at various times up to September, 1885, put stock upon the land, making with the improvements before mentioned a total expenditure of $42,600, leaving about $35,000 as the purchase money of the property, the subject of this suit, showing a profit of $17,000. And in the face of this the defendant claims to be entitled to a reduction of about one-half in this purchase money.

It is not our duty to say more with respect to this transaction, than that it appears that the purchase by the Company was conducted in a loose manner. The Company must have known that the defendant had not a title to the property, and that he had only paid $1,000 of his purchase money, so that they took this property paying the defendant what was equivalent to cash, he having to pay the balance of $17,000 and interest, before the property would become his or the Company's, no security being taken for such balance, and in fact nothing has been

paid by the defendant since. The Company may have rights in the matter but they cannot be jeopardized by the decree made, and it will be competent for them to appear at any future proceedings.

The case of the *Earl of Durham vs. Legard* we consider to be directly in point, and the principle there and by the decree herein established is anything but new. See *Savage vs. Taylor*, Cas. Temp. Talb. 234. (1735). *King vs. Thompson*, 9 Peters, 204.

We are therefore of opinion that the decision of the Chancellor is correct and must be sustained, but as a considerable sum of principal and interest has accrued due since the commencement of the suit, a reference must be made to a master to ascertain the amount due according to the agreement on the first day of July instant, and in the event of the defendant electing in the terms of the decree, he must pay the amount so ascertained into Court and must execute a mortgage in terms of the agreement for the balance. The complainant must execute and acknowledge a proper warranty deed of the property and deposit the same in Court to be delivered to the defendant, on his complying with the terms of the decree; leave must be reserved for the parties to apply ; a copy of this decree must be served upon the Woodlawn Dairy Company so that it may attend on any future proceedings as it may be advised.

The defendant must pay the costs of this appeal.

Appeal dismissed with costs.

*W. A. Whiting and Kinney & Peterson* for complainant.

*S. B. Dole,* for defendant.

Honolulu, July 31st, 1886.