CLARK v. ROSARIO MINING & MILLING CO.†

(Circuit Court of Appeals, Ninth Circuit. February 21, 1910.)

No. 1,770.

1. SPECIFIC PERFORMANCE (§§ 58, 128*)—CONTRACTS ENFORCEABLE.

A court of equity is without jurisdiction of a suit for the specific performance of a contract which shows on its face that in case of its breach by defendant complainant is not entitled to a specific performance, but is limited to the recovery of a stipulated sum as liquidated damages; nor can the court in such case retain the suit for the purpose of awarding damages.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 180, 412–419; Dec. Dig. §§ 58, 128.*]

2. SPECIFIC PERFORMANCE (§ 95*) — CONTRACTS ENFORCEABLE — CONTRACT FOR SALE OF REALTY—MISTAKE AS TO TITLE.

A court of equity will not decree the specific performance of a contract for the sale of property against the purchaser, when it appears that the vendor's title is in fact defective and unmerchantable, notwithstanding a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied May 9, 1910.

recital in the contract that the title has been examined by the purchaser and found satisfactory.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 257-277; Dec. Dig. § 95.*]

3. SPECIFIC PERFORMANCE (§ 51*) — CONTRACTS ENFORCEABLE — FAIRNESS AND REASONABLENESS.

By a contract between complainant, which was the owner of a mine, and defendant and his associates, who had been developing and operating the mine under prior contracts, defendant made an offer of $400,000 for the mine, to remain open and subject to acceptance by complainant at any time during one year. Defendant was to operate the mine for one year, unless possession was sooner demanded by complainant, and was to make extensive improvements within 90 days, retaining 80 per cent. of the output during that time to apply on the cost, after which during the remainder of the year any profit above operating expenses was to be paid to complainant. Defendant was given an option to purchase the mine at the end of the year for $600,000, provided complainant had not previously sold it, which it reserved the right to do, stipulating only that defendant should have a preferred right to purchase at the price offered, and that, if it was sold for more than $600,000, defendant should receive the excess up to $50,000, to reimburse him for improvements made. It was also provided that, in case complainant took possession at the end of the year or before, it should pay defendant for certain supplies on hand. At the end of the year complainant accepted defendant's offer, but he refused to complete the purchase. *Held*, that the contract was one-sided and unconscionable, and that a court of equity would not decree its specific performance against defendant.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 153-154; Dec. Dig. § 51.*]

Appeal from the Circuit Court of the United States for the Northern District of California.

Suit in equity by the Rosario Mining & Milling Company against C. W. Clark and others. Decree for complainant, and defendant Clark appeals. Reversed.

The appellee was the complainant in this suit, the defendants being the appellant, Clark, who was the principal defendant, Frank L. Sizer, the theretofore confidential mining expert of Clark, and William Falconer, as the administrator of the estate of Edward L. Whitmore, deceased, who, during the times in question, was Clark's private secretary and confidential agent. The suit was for the specific performance of a written contract made May 1, 1902, between the appellee, named therein as the party of the first part, and Clark, Whitmore, and Sizer, named therein as parties of the second part, concerning certain mining property known as the "Rosario Mine," situated in the state of Chihuahua, Mexico, specifically described in the bill. The respective parties had previously entered into two other contracts respecting the same property, which are referred to in the contract of May 1, 1902, as follows:

"Whereas, on December 12, 1900, the parties hereto entered into a contract whereby the second parties were given an option to purchase said properties for $800,000, and bound themselves to do certain development work upon said property, and the treatment of the ores thereof, including stipulations binding the second parties to repair and improve said property and appurtenances, in the way of building and machinery thereof, and, in case of the failure of the second party to exercise their option and buy the property, then all such improvements and machinery and appliances as the second party should put upon the property should become the property of the first party without cost or expense; and, whereas, on the 12th day of August, 1901, said contract was extended so as to continue said option until May 1, 1902, and the second parties again bound themselves to continue the possession and development of said

mine, and a proper treatment of the ores thereof until May 1, 1902; and, whereas, in each of said contracts said second parties bound themselves to examine the titles to said mining property and other property above described; and, whereas, said second parties by said contracts bound themselves to make reports and maps of said property, to be furnished to the first party, and showing the extent of the working upon and value of the said property and its ores, treatment, and tests thereof; and, whereas, the said second parties have, after examination of said property and the titles thereto, notified the first party that the second party is satisfied that the titles to said property are in the first party; and, whereas, the second party has notified said first party that they will not exercise their said options to buy said property at the price of $800,000 but have offered to the first party to buy the said property at the price of ($400,000) four hundred thousand dollars cash (American gold); and, whereas, the first part(y) has refused to accept said offer; and, whereas, said option of the second parties to purchase said properties has expired, and the first party has become and is entitled to the possession of said property, together with all of the improvements, repairs, machinery, materials, tools, equipments, and betterments placed thereon by the second party, excepting current supplies of wood, groceries, chemicals, and unused hardware supplies, and entitled to the maps and complete report upon said property provided for in said contracts, which map and reports have not been furnished to the first party; and, whereas, it is the desire of each of the parties to further develop said property by the development work hereinafter stipulated, to the end of more certainly determining the value of said property, so that the first party may be able to sell the same to the best advantage to any purchaser which it may find, and, in the event of a sale at a figure above $600,000 to other parties, that the first party will out of such proceeds compensate the second parties in part for the expenditures they have made in development of said property as herein provided; and, whereas, in order to carry out this arrangement and purpose, and to afford the second parties an opportunity to buy said property at the price of $600,000 in the event of a failure of the first parties to make a sale of said property during the life of this contract at more than $600,000, and to afford, the second parties a preference right to buy said property at the price of $600,000 as herein stipulated; and, whereas, it is necessary to keep said property open and the operating plant in operation; and, whereas, the second parties, as a consideration in part for this option contract, are desirous of keeping open said offer to buy said property at the price of $400,000, subject to the right of the first party to accept the offer at any time during the life of this contract:

"Now, therefore, it is hereby mutually agreed between the parties hereto as follows:

"(1) The second parties offer to the first party to buy from the first party said property, and to pay to the first party therefor the sum of ($400,000) four hundred thousand dollars, American gold, at Ft. Worth, Tex., and to make said payment within thirty days after being notified of an acceptance by the first part(y) of said offer; provided, however, that if the said offer is accepted within the next four months the second party shall have until September 1, 1902, to make such payment, the first party concurrently or as near as may be with such payment to cause to be transferred to the second parties the titles which the first party through its directors or otherwise has in and to said property; and the second parties agree to leave said offer open for one year from this date, subject to the acceptance of the first party at any time during said year. Said titles having been examined by the second parties, it is agreed that the same are good and sufficient.

"(2) The first party, reserving the right to sell said property and contract with reference thereto to other parties, gives and grants to the second parties an option to buy said property at the end of the said year, to wit, on May 1, 1903 (said option to be then exercised or forfeited), at the price of $600,000 cash or its equivalent, American gold, provided the first party shall not have sooner sold said property, or made a bona fide contract to do so: and provided, further, that before making any offer to sell said property at $600,000 or less to other parties the first party shall give to the second parties a preference right to buy the same at said price so offered to others, and to that end shall

notify the second parties of such contemplated sale or offer, and the second party shall promptly exercise its performance (preference) right upon being so notified and afforded an opportunity to do so, and shall have 30 days after electing to take the property in which to make the payment for the property, whereupon concurrently or as near as may be the first party shall cause said property to be conveyed to the second parties. If the second parties, upon being so afforded an opportunity to exercise such performance right to purchase, shall fail to do so, then such right shall cease.

"(3) The first party, reserving full rights to make any sale it may choose of said property during the year, agrees that if during the year up to May 1, 1903, the first party shall sell said property or make a valid contract of sale thereof to other parties, resulting in a sale of the same at a price greater than $600,000, it shall pay to the second parties $50,000 out of the excess of the purchase price above $600,000, except that if such excess does not amount to $50,000, then such amount as the purchase price upon such sale shall exceed $600,000; provided that, if the purchase price upon such sale shall not exceed $650,000, the second parties shall have the preference right to take the property at the price of $600,000; provided, also, that in the event of a sale to other parties, partly on a credit, the payment of the $50,000, or the excess over $600,000, if less than $50,000, if under this contract the second parties shall become entitled to it, shall be apportioned among the time payments of the purchase money upon such sale, in proportion as it shall bear to the whole; provided, however, that not less than one-half of the amount to which the second parties shall be entitled shall be paid out of the first cash payment."

The contract in suit then provided for the right of free access to the mine by the first party thereto, and its appurtenances, including all books and records of its operation, and required the parties of the second part thereto to remain in possession of the property, and at their own expense to operate it until May 1, 1903, unless sooner sold, and, during the first 90 days from the date of the contract in suit, to perform certain specified work in and about the mine, and during that period of 90 days to pay to the first party 20 per cent. of the gross bullion output from the mine, mill and cyanide, or other reduction plant, and to operate the mill to its full capacity, and then provided that:

"After the end of the 90 days or the completion of said work, if sooner completed, the second parties shall, at the option of the first party, continue the operations of the mill and cyanide plant and to keep the mine unwatered and for the purpose of paying expenses shall have the bullion output of the said mill and cyanide plant, and if the output shall exceed such expenses then the excess shall be paid to the first party as royalty, but no other royalty shall be paid out of such output, but the ore so worked during that time shall not be sorted or picked, nor the rich streaks taken out; provided that after said work so specified shall have been completed, and in any event after 90 days, the first party shall have the right at any time to take possession of said property, and all of the improvements, betterments, machinery, and appliances, tools, apparatus, buildings, and supplies of every kind useful in the operation of the property, and as to all such supplies as under either of said preceding contracts the first party is to pay for, upon said property being turned over to it, an inventory shall be made and the same to be paid for at their reasonable value, it being understood that in determining what supplies and materials are to be turned over to the first party without being paid for, and what of such supplies are to be paid for, said original contracts are to be looked to and to govern."

The contract in suit next made certain provisions concerning the expenses of the work, and for certain settlements and proceedings. Its eighth, ninth, and tenth clauses are as follows:

"(8) In the event of an acceptance by the first party of the offer of the second parties to buy said property at the price of $400,000, and a failure or refusal of the second parties to make good the offer to buy said property, then the second parties shall be liable to the first party in damages in the stipulated sum of $100,000. The object of this clause of this contract is to make the measure of damages certain, whereas, without such stipulation, by reason of the peculiar character of the property and situation and surroundings of the

parties,· it would be impossible to arrive at any just and correct measure of .damages by proof in a court of law; and in the event the first party shall not sell said property to other parties or contract to do so according to the terms of this contract, and the second parties shall, under the provisions of this contract become entitled to exercise their option to buy the said property at $600,-000, and shall elect to exercise said option and shall thereupon offer to purchase said property at said price, and the first party shall fail or refuse to comply with this contract to sell their said property at that price, then the first party shall be liable to the second parties in liquidated damages to the amount of $100,000. This shall not deprive the second parties of the right to waive damages and have specific performance of this contract.

"(9) Upon the termination of this contract, or at any time at which the first party shall elect to take possession of said property, the same shall be turned over to the first party, together with (1) all of the betterments, machinery, repairs, apparatus, supplies for all appliances and machinery and all parts thereof, tools, assay appliances, and all other appliances upon the property, free of any cost to the first party, and (2) also shall be turned over to the first party all of the supplies on hand in the way of wood, charcoal, lime, merchandise, groceries, feed, powder, caps and fuse, cyanide, chemicals, and all other supplies, the first party to pay for such supplies as are mentioned under this paragraph (3) their reasonable value. In determining what of said materials shall be paid for and what of the same shall 'be turned over without compensation, the original contracts shall govern.

"(10) It is further agreed by and between the parties hereto that this contract takes the place of and is a substitute for each of said original contracts, except in so far as they are referred to for the purpose of furnishing a basis of settlement and no matter of supplies, materials, maps and reports, etc.; but in the event the second parties fail to perform the obligations of this contract, then the obligations of the second parties and liability thereunder for all damages under the said original extension contracts shall exist in the same manner and to the same extent as if this contract had not been made, the full performance of this contract being a condition precedent to the second parties being relieved of any liability under said contracts."

In its bill the complainant alleged the death of Whitmore, the appointment of Falconer as administrator of his estate, and that both Falconer and Sizer were residents of the state of Montana, and not amenable to the process of the court below, and that after the expiration of one year from the date of the contract in suit it had tendered its deeds to Clark and Sizer, and to Falconer as the administrator of the estate of Whitmore, and that they had failed and refused to accept them, or to pay the $400,000 which it claimed to be due. The prayer of the bill was for specific performance and general relief.

Neither Sizer nor Falconer ever made any appearance, but Clark demurred to the bill generally and specifically; his general demurrer being on the ground that the complaint did not state a case entitling it to any equitable relief, and also upon the ground that "it appears by complainant's own showing that it is not entitled to the relief prayed for in and by said bill." The demurrer being overruled, Clark answered, in which answer he set up various facts which he alleged showed a conspiracy entered into by and between the officers and agents of the complainant and his confidential employés and co-contractors, Sizer and Whitmore, and that his assent to the contract was obtained by false representations made to him in pursuance of such conspiracy, that the title of the complainant to the property is so defective as to be unmerchantable, and that the provisions in the contract were unconscionable, in that they purported to hold him bound, while the complainant reserved the right to nullify the same at any time. The evidence in the case was taken wholly by deposition out of the hearing of the court.

On final hearing the appellant objected to the power of the court to make any decree in the absence of his codefendants. The court below held that the contract by its terms excluded the appellee from the right to its specific performance, notwithstanding which the court proceeded to award the complainant judgment for the $100,000 stipulated damages for breach of the contract.

Tobin & Tobin and F. S. Brittain, for appellant.

Drew Pruitt, for appellee.

Before GILBERT and ROSS, Circuit Judges, and DE HAVEN, District Judge.

ROSS, Circuit Judge (after stating the facts as above). The first and an insuperable obstacle to the affirmance of the decree appealed from is that the aggrieved party brought its suit in a court of equity to enforce the specific performance of a written contract, which contract showed upon its face, as the court below expressly held, that for its breach by the appellant and his associates the appellee should not be entitled to a specific performance of it, but should be limited to a stipulated sum as damages of $100,000. Under such circumstances, the only appropriate tribunal for the recovery of that money demand was a court of law. It did not come within the jurisdiction of a court of equity. San Francisco National Bank v. Dodge, 197 U. S. 70, 25 Sup. Ct. 384, 49 L. Ed. 669; Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873; Thompson v. Central Railroad Co., 6 Wall. 134, 18 L. Ed. 765; Phœnix L. I. Co. v. Bailey, 13 Wall. 616, 20 L. Ed. 501. But, even if it could be held that the case made by the bill came within the jurisdiction of a court of equity, was the case, in view of the issues and of the evidence, such as justified the court below in retaining it for the purpose of awarding money compensation for the breach of the contract by the appellant and his co-contractors?

The contract recited that the appellee was the owner of the property it contracted to sell and which the appellant and his associates agreed to buy. It is true that the contract (which it was shown was drawn by the appellee's attorneys) also recited that the appellant and his associates had examined the appellee's title to the property and were satisfied therewith. In the same connection, however, it will be observed that although the contract recited that the appellee was the owner of the property, when it came to provide for the conveyance of it to the appellant and his associates upon the performance of their agreements, the contract provided for the transfer of "the titles which the first party [the appellee] through its directors or otherwise has in and to said property."

By his answer to the bill the appellant set up, among other things, that the appellee's title was defective, and in support of that issue introduced evidence tending to sustain it. That evidence the trial court failed to consider, deeming the appellant concluded by the provisions of the contract above referred to. If there was a mistake in regard to the title, and if, in truth, the appellee's title to the property was not good, we do not understand that, under the principles governing courts of equity, specific performance of such a contract would be enforced. Moreover, there are other provisions of the contract in question which we think would preclude a court of equity from enforcing specific performance of it. As will be seen from its recitals, two previous contracts had been made between the parties concerning the property, under which the appellant and his associates had, at their own expense, performed certain development work thereon, under

options to purchase the property, which options they declined to exercise, and, the same having expired, the appellee became entitled to the possession of the property, "together with all of the improvements, repairs, machinery, materials, tools, equipments and betterments placed thereon" by the appellant and his associates, together with other specified things, "excepting current supplies of wood, groceries, chemicals, and unused hardware supplies"; and proceeds the contract in question:

"Whereas, it is the desire of each of the parties to further develop said property by the development work hereinafter stipulated, to the end of more certainly determining the value of said property, so that the first party [appellee] may be able to sell the same to the best advantage to any purchaser which it may find, and in the event of a sale at a figure above $600,000 to other parties that the first party [appellee] will out of such proceeds compensate the second parties [appellant and his associates] in part for the expenditures they have made in development of said property as herein provided; and, whereas, in order to carry out this arrangement and purpose, and to afford the second parties [appellant and his associates] an opportunity to buy said property at the price of $600,000, in the event of a failure of the first party [appellee] to make a sale of said property during the life of this contract at more than $600,000, and to afford the second parties [appellant and his associates] a preference right to buy said property at the price of $600,000, as herein stipulated; and, whereas, it is necessary to keep said property open and the operating plant in operation; and whereas, the second parties [appellant and his associates], as a consideration in part for this option contract, is desirous of keeping open said offer to buy said property at the price of $400,000, subject to the right of the first party [appellee] to accept the offer at any time during the life of this contract,"

—the respective parties stipulated and agreed in effect: (1) That the appellant and his associates should keep open for one year from the date of the contract in question an offer therein made of $400,000 for the property, and to make such payment therefor within 30 days after being notified by the appellee of its acceptance; provided, that, if the offer should be accepted within the then next four months, the appellant and his associates should have until September 1, 1902, within which to make such payment. (2) The appellee reserved the right to sell the property to or contract with reference thereto with other parties at any time; provided that, before selling it for $600,000, or less, to other parties, "the first party [appellee] shall give to the second parties [appellant and his associates] a preference right to buy the same at said price so offered to others, and to that end shall notify the second parties [appellant and his associates] of such contemplated sale or offer, and the second party shall promptly exercise its performance (preference) right upon being so notified and afforded an opportunity to do so, and shall have thirty days after electing to take the property in which to make the payment for the property"—with the further option to the appellant and his associates to buy the property at the end of one year for $600,000, American gold, or its equivalent. (3) The appellee further agreeing that:

"If during the year up to May 1, 1903, the first party [appellee] shall sell said property or make a valid contract of sale thereof to other parties, resulting in a sale of the same at a price greater than $650,000, it shall pay to the second parties $50,000 out of the excess of the purchase price above $600,000, except that, if such excess does not amount to $50,000, then such amount as

the purchase price upon such sale shall exceed $600,000; provided that, if the purchase price upon such sale shall not exceed $650,000, the second parties [appellant and his associates] shall have the preference right to take the property at the price of $600,000; provided, also, that in the event of a sale to other parties, partly on a credit, the payment of the $50,000 or the excess over $600,000, if less than $50,000, if under this contract the second parties [appellant and his associates] shall become entitled to it, shall be apportioned among the time payments of the purchase money upon such sale in proportion as it shall bear to the whole; provided, however, that not less than one-half of the amount to which the second parties shall be entitled shall be paid out of the first cash payment."

The contract then provided for the right of free access to the mine by the appellee, and to all books and records of its operation, and required the appellant and his associates to remain in possession of the property, and at their own expense to operate it for one year, unless it should be sooner sold, and during the first 90 days to perform certain specified work in and about the mine, and during that period of 90 days to pay to the appellee 20 per cent. of the gross bullion output from the mine, or mill and cyanide or other reduction plant, and to operate the mill to its full capacity, and then provided that after the expiration of the 90 days, or the completion of the specified work, if sooner completed, the appellant and his associates should at the option of the appellee continue the operation of the mill and cyanide plant, and keep the mine unwatered, and, for the purpose of paying expenses, should have the bullion output of the mill and cyanide plant; provided, however, that if the output therefrom should exceed such expenses the excess should be paid to the appellee as royalty, with the further provision that after the completion of the specified work, if completed before the expiration of the 90 days, and in any event after the 90 days expired, the appellee should have the right to take possession of the property at any time, together with—

"all of the improvements, betterments, machinery, and appliances, tools, apparatus, buildings, and supplies of every kind useful in the operation of the property, and as to all such supplies as under either of said preceding contracts the first party is to pay for, upon said property being turned over to it, an inventory shall be made, and the same to be paid for at their reasonable value, it being understood that in determining what supplies and materials are to be turned over to the first party [appellee] without being paid for, and what of such supplies are to be paid for, said original contracts are to be looked to and to govern."

Then come, after certain provisions concerning the expenses of the work and certain settlements, the provision defining the appellee's right to accept the offer of the appellant and his associates to buy the property for the sum of $400,000, and their obligation to pay the appellee $100,000 in the event of their failure to make good such offer, and providing that upon the termination of the contract, "or at any time at which the first party shall elect to take possession of said property, the same shall be turned over to the first party, together with (1) all of the betterments, machinery, repairs, apparatus, supplies for all appliances, and machinery and all parts thereof, tools, assay appliances, and all other appliances upon the property, free of any cost to the first party, and (2) also shall be turned over to the first party all of the supplies on hand in the way of wood, charcoal, lime, merchandise, gro-

ceries, feed, powder, caps and fuse, cyanide, chemicals and all other supplies, the first party to pay for such supplies as are mentioned under this paragraph (3) their reasonable value," with certain minor provisions shown in the statement.

The effect of the contract was to require the appellant and his associates to do very extensive development work upon the property at their own expense for one year (save the right to apply 80 per cent. of the gross bullion output to expenses during the first 90 days); to operate the reduction works to their full capacity for one year, and pay the appellee 20 per cent. of the gross output during the first 90 days, regardless of the expense of getting it out, and all of the profits thereafter; to keep open their offer to buy the property for $400,000 at any time within the year, even though the development work should prove the mine valueless, with the consequent liability in the sum of $100,000 in the event of their failure to comply with the terms of the offer, should it be accepted; and with the reserved right on the part of the appellee to sell the property to any other party at any price it might fix, in the event the development work performed by the appellant and his associates should prove the mine to be of great value, with the condition that, in the event such sale to a third party should equal or exceed $650,000, the appellee would pay $50,000 thereof to the appellant and his associates, or any less excess over $600,000, with the preferred right already mentioned to the appellant and his associates to become the purchaser at the price of $600,000. The only real obligation the contract seems to have imposed upon the appellee was to pay for the stores and supplies the appellant and his associates might have on hand in the event it should resume possession of the property, which it reserved the right to take at any time after 90 days (thereby depriving the appellant and his associates of the right to further explore it), and to sell the property to the appellant and his associates at the end of the year for $600,000, provided it had not already sold or contracted it to somebody else.

It is difficult to conceive of a much more one-sided contract. It is one that we do not think any court of equity should decree the specific performance of. "To stay the arm of a court of equity from enforcing a contract," said the Supreme Court in Pope Manufacturing Co. v. Gormully, 144 U. S. 224, 236, 12 Sup. Ct. 632, 637, 36 L. Ed. 414, "it is by no means necessary to prove that it is invalid. From time immemorial it has been the recognized duty of such courts to exercise a discretion, to refuse their aid in the enforcement of unconscionable, oppressive, or iniquitous contracts, and to turn the party claiming the benefit of such contract over to a court of law." In Willard v. Tayloe, 8 Wall. 567, 19 L. Ed. 501, the same court said:

"In general it may be said that the specific relief will be granted when it is apparent from a view of all the circumstances of the particular case that it will subserve the ends of justice, and that it will be withheld when from a like view it appears that it will produce hardship or injustice to either of the parties. It is not sufficient, as shown by the cases cited, to call forth the equitable interposition of the court, that the legal obligation under the contract to do the specific thing desired may be perfect. It must also appear that the specific enforcement will work no hardship or injustice, for if that result would follow the court will leave the parties to their remedies at law."

In King v. Hamilton, 4 Pet. 311, 327, 7 L. Ed. 869, the Supreme Court, in speaking of the power of a court of equity to decree specific performance, said:

"But this power is to be exercised under the sound judicial discretion of the court, with an eye to the substantial justice of the case. When a party comes into a court of chancery seeking equity, he is bound to do justice, and not ask the court to become the instrument of iniquity. Where a contract is hard and destitute of all equity, the court will leave parties to their remedy at law; and if that has been lost by negligence, they must abide by it. It is a settled rule, therefore, to allow a defendant in a bill for specific performance of a contract to show that it is unreasonable or unconscientious."

In Marks v. Gates, 154 Fed. 481, 484, 83 C. C. A. 321, 324, 14 L. R. A. (N. S.) 317, we said:

"A court of equity will not grant pecuniary compensation in lieu of specific performance unless the case presented is one for equitable interposition such as would entitle plaintiff to performance but for intervening facts, such as a destruction of the property, the conveyance of the same to an innocent third person, or the refusal of the vendor's wife to join in the conveyance"—citing Cooley v. Lobdell, 153 N. Y. 596, 47 N. E. 783; Matthews v. Matthews, 133 N. Y. 679, 31 N. E. 519; Bourget v. Monroe, 58 Mich. 563, 25 N. W. 514; Eastman v. Reid, 101 Ala. 320, 13 South. 46; Milkman v. Ordway, 106 Mass. 232.

In other words, the ancillary power to award compensatory damages can only be exercised in a case where the equitable relief prayed for might have been given. See McQueen v. Chouteau's Heirs, 20 Mo. 222, 64 Am. Dec. 178.

The case of Cathcart v. Robinson, 5 Pet. 264, 8 L. Ed. 120, relied on by the court below in support of its decision, is quite different from the present one. There Robinson properly brought his suit in the court of equity to enforce a contract of sale, as is expressly stated by the court in its opinion, while here the appellee never had any right to go into a court of equity, for the reason that the contract upon which the suit is based expressly showed upon its face, as the court below held, that the appellee was not entitled to specific performance of it, but only to damages in the event of its breach.

The judgment is reversed, and the case remanded, with directions to the court below to dismiss the suit, at the complainant's cost.