[Civ. No. 13545. Second Dist., Div. One. June 11, 1942.]

EAGLE OIL & REFINING COMPANY, INC. (a Corporation), Appellant, v. GROVER W. JAMES, Respondent; IONA JAMES, Intervener and Respondent.

[Civ. No. 13546. Second Dist., Div. One. June 11, 1942.]

GROVER W. JAMES, Respondent, v. EAGLE OIL & REFINING COMPANY, INC. (a Corporation), Appellant.

Cobb, Campbell & Kelley for Appellant.

Potter & Potter for Respondents.

YORK, P. J.—The first of the above entitled actions was instituted by Eagle Oil & Refining Co., Inc., against Grover W. James (1) for specific performance of a contract alleged to have arisen upon the exercise of an option dated November 8, 1940, and (2) for $5,000 in damages in the event specific performance could not be had.

The second action was brought by Grover W. James for unlawful detainer of the properties covered by the contract sued upon in the first action. Eagle answered the complaint in the second action admitting all of the allegations thereof, except that there was due or owing any sum to James, and setting up as a separate defense the pendency of the first action.

Judgment in each action was rendered in favor of James, no evidence being offered or received in the unlawful detainer action other than the judgment in the action for specific performance.

Appeals from both judgments are presented to this court upon the same set of briefs, appellant Eagle Oil & Refining Co., Inc., contending as follows:

(1) That the court's finding that the contract sued upon was not just, fair and equitable, is contrary to the evidence;

(2) That in finding to the effect that the property involved was held in joint tenancy and that respondent's wife (the other joint tenant) did not join in the execution of the option, does not render the option void so as to defeat specific performance;

(3) The court erred in finding no bad faith existed on the part of respondent James;

(4) The court erred in finding and entering judgment denying appellant Eagle Oil & Refining Co., Inc., any damages.

A brief summary of the facts which form the background of the instant litigation follows:

Prior to June 21, 1939, respondent Grover W. James and his wife, Iona (intervener) owned as joint tenants a parcel of land, referred to herein as parcel 1, located at 1700 West Adams Street, in the city of Los Angeles, upon which was located a fully equipped gasoline service station. Respondent was also the lessee in leases covering parcel 2 at Pico and La

Brea; parcel 3 at Temple & Alvarado; and parcel 4 at West Washington and Hoover, upon each of which was located a fully equipped service station.

On June 21, 1939, respondent leased to Gasoline Sales Company said four parcels at a rental of $311.50 per week, said lease to run to September 20, 1942, with right of lessee to terminate on thirty days' notice after the expiration of the first year of said term. On April 2, 1940, Gasoline Sales Company assigned said lease to appellant, which assignment was consented to in writing by respondent James on March 18, 1941.

On October 29, 1940, appellant wrote respondent that unless he could see his way clear to accept its proposal for certain reductions in rentals, it would be forced to serve him with notice of cancellation of the lease.

According to respondent's testimony, he called at the office of appellant company just before November 8, 1940, where the following conversation took place between him, Mr. Nelson, the president, and Mr. Sterling, the vice president of Eagle Oil & Refining Co.:

"Mr. Nelson said, 'James, we are going to give the stations back to you.' I kind of hesitated and I said, 'What?' and he said, 'We are going to give the stations back to you unless you cut the rent.' 'Why?' I says, 'Those four stations in April and May pumped 240,000 gallons of gasoline and now you want to give the stations back to me,' and at that Mr. Sterling walked into the office and Mr. Sterling says—Mr. Nelson says to Mr. Sterling, who is the vice president, he says, 'I have been telling James that we are going to give the stations back to him,' and Mr. Sterling says, 'Yes, if he doesn't cut the rent,' and we had a little discussion and I said, 'That's out, I can't cut the rent. I made you fellows a wonderful deal that is perfectly satisfactory,' and I says, 'Now you want to cut the rent, that's out,' and Mr. Sterling says, 'Make us some kind of an agreement,' and I says, 'I haven't said anything to my wife about this set up.' Mr. Sterling says, 'We want to show the Board of Directors some kind of a deal, and will you make us some kind of a deal?' and then I says, 'What about $12,000 for Number Three, Number Four and Number Five (Two), they are known as Temple and Alvarado, Hoover and Washington and Pico and La Brea?' Then I says, '$250.00 for Number One at Normandie and Adams.' We had quite a little discussion there.

Mr. Sterling says, 'I will give you $10,000 for Number (Two) Number (Three) and Number (Four) and $200.00 for Number One.' He said, 'Will you sign a letter?' and at that he got up out of the chair and walked out and brought a letter back and handed to me to read . . . So I looked at the letter and I said, 'Mr. Sterling, my wife hasn't seen this letter and I don't know that she will sign it or not,' and he said, 'We want this to show to the Board of Directors,' and we had a little discussion there, and I said, 'All right, I will sign it,' and then he says to me, 'Will she sign the papers?' and I said, 'Mr. Sterling, that I don't know'.''

The letter so signed, addressed to appellant and dated November 8, 1940, which is referred to throughout the proceedings herein as the "option," reads as follows:

"In accordance with your letter of October 29, 1940, in regard to Parcel No. 1 — 1700 W. Adams, Los Angeles, I would agree to lease to you this station for a period of ten years at the rate of $200.00 per month.

"In regard to Parcel No. 2 — S/E corner of Pico and La Brea, leased by the undersigned from Mr. Heath, and now sub-leased to you; and in regard to Parcel No. 3 — S/E corner of Temple and Alvarado, leased by the undersigned from Tobias R. Archer and now subleased to you; and in regard to Parcel No. 4 — 1241 W. Washington leased by the undersigned from Elizabeth W. Thomas and now leased to you. Please be advised that I would be willing to accept the total sum of $10,000.00 for the assignment of the above listed parcels; and assignment of all personal property belonging to the undersigned; and the cancellation of the present agreement between the Eagle Oil and Refining Co. Inc. and myself.

"I would also endeavor to secure options for extensions of the present leases on Parcel No. 2 and Parcel No. 4.

"If the above offer meets with your approval I ask that you kindly advise me within 15 days from date hereof.

"Yours very truly, (Signed) Grover W. James."

Respondent further testified that "one week later I didn't get my rent, so I first called and I couldn't get any satisfaction by phone and I went back to the Eagle Oil Company and this time I saw Mr. Sterling alone and I says, 'Mr. Sterling, I have been looking around for stations and I find that I can't build one of these stations on major corners like we have for less than $7500.00 to $8500.00.' Well, he handed me my check and that is all that was said.''

On November 22, 1940, appellant exercised the option of November 8, 1940, in the following language:

"Dear Mr. James: We refer to your letter to us dated November 8, 1940, wherein you made the following offer to us (then follows a copy of said letter hereinbefore set out).

"We advise you hereby that we accept your offer as outlined above. We shall appreciate your arranging to meet with us at your earliest convenience for the purpose of preparing and executing the necessary papers and documents to consummate this transaction."

On December 2 and 7, 1940, respondent procured extensions of the leases covering parcels three and four, respectively.

On December 26, 1940, respondent again called at the office of appellant and "I went into Mr. Sterling's office. No more had I sat down, Mr. Sterling pressed the buzzer and had his attorney come in and sit down. Then our conversation began about the deal and I said, 'Mr. Sterling, I can't go through with the deal that you made.' He says, 'Why?', and I says, 'Because I haven't told my wife about this setup,' and I says, 'I don't think that she would go through with the deal,' and I says, 'I never would have signed that paper if you and Mr. Nelson hadn't harassed me into signing it.' . . . Then Mr. Sterling's attorney pointed on Mr. Nelson's desk to the paper that I had signed and Mr. Sterling got up and said, 'Well, we will sue you and make you go through with it'."

During the holidays of 1940, Mrs. Iona James, wife of respondent, learned that her husband had given an option to appellant for an assignment of said leases, and withheld her consent to the same.

On December 27, 1940, appellant opened an escrow with the Whittier National Trust & Savings Bank to consummate the terms of the option agreement of November 8, 1940.

On January 8, 1941, appellant filed its action for specific performance, on April 23, 1941, Iona James filed her complaint in intervention therein, and on April 15, 1941, respondent filed his action against appellant for unlawful detainer.

■ In connection with its first point, appellant urges that there is no substantial evidence to support the finding of the trial court as to the rental value of parcel one and the reasonable purchase price of parcels two, three and four, to wit:

"It is not true that the option given by defendant to plaintiff on November 8, 1940 or the contract to purchase by plaintiff on November 22, 1940, are or were at all times fair, just

or equitable, or the consideration to be paid of $200.00 per month as rental for Parcel 1 or the sum of $10,000.00 to be paid for the purchase of the leasehold estate owned by defendant Grover W. James in respect to Parcels 2, 3 and 4 was fair, just or equitable or the reasonable market value of the rental of Parcel 1 or the purchase price of Parcels 2, 3 and 4, but the court finds that the rental value of said Parcel 1 was $350.00 per month, and the value of said Parcels 2, 3 and 4 was in excess of $40,000.00.''

Appellant argues in this respect that ''since these (expert) witnesses based their opinions on facts and premises not supported by the evidence, the opinions should fall.''

The above finding was based upon directly conflicting evidence. In giving their opinions of the reasonable rental value of parcel 1 and the reasonable market value of parcels 2, 3 and 4, as is usual with expert testimony, the witnesses called by appellant placed a conservative value on the property, while those testifying on behalf of respondent were quite liberal in their estimates. However, an examination of the opinions given by all of these witnesses, including those given by respondent (who was entitled to give his opinion as to the value of the property owned by him), reveals that the evidence so adduced was based upon a consideration of the following factors:

(1)   The location of the oil stations, the size of the lots and the accessibility of approach thereto;

(2)   The buying power in the districts where stations were located;

(3)   The flow of traffic on the arteries where stations were located;

(4)   The aggregate cost of equipment installed and in use, as well as cost of replacements;

(5)   The unexpired term of the leases and the possibility of renewals thereof;

(6)   The available space for billboard advertising and the amount realized from established advertising;

(7)   The monthly gallonage of gasoline sold at the four stations, the price at which sold and competition in the districts where the stations were located;

(8)   The type of business, whether cut-rate or truck;

(9)   The present income derived from the stations.

Mr. Frederick C. Degens, an employee of respondent who assisted in making an inventory of the service stations at the

time they were taken over by Gasoline Sales Company, testified that the average monthly gallonage sold at parcel one from January to June, 1939, was 26,971; at parcel three, 27,871, and at parcel four, 24,612. Respondent testified that the approximate monthly average of gasoline sold at parcel two in January of 1939 was 45,000 gallons.

Henry Claman, a real estate broker specializing in sales of gas stations for a period of nineteen years, testified on behalf of respondent and basing his opinion of rental value on gallonage alone, i. e., 95,000 gallons a month as of April, 1939, sold at the stations located on parcels two, three and four, stated: " . . . three stations like that are worth a terrific bonus outside of the value of the rental, gallonage like that is very hard to obtain. A major company figures if they can get a 10,000 gallon station and invest $12,000 in improvements, they have a very fine station. To get a 34,000 gallon station, they just dream about that, like in Westwood where they invested $40,000 to get such a station, they go away out of proportion, but on a straight gallonage basis, these stations are worth at least $1350.00 a month rent, that is without any bonus attached to it. *By the Court*: That is the three stations? A. Yes, the three stations. Q. *By Mr. Potter, Jr.*: That is figured upon the basis of one and a half cents a gallon? A. Yes, one and a half cents a gallon. Q. You spoke of a bonus that should be paid, a large bonus for these particular stations on account of the gallonage and referred to Standard paying $12,000 for 10,000 gallons what in your opinion would be the bonus that should be paid on stations of this gallonage? . . . A. It isn't set, your Honor, it is a matter of how badly the company wants to get in the field, they want to get distribution and they pay according to how bad they need it. A bonus like this $25,000 to $40,000 would not be excessive."

With the foregoing in mind, it is obvious that there is substantial evidence to support the finding objected to by appellant.

■ Appellant urges that the finding by the trial court to the effect that the property herein was held in joint tenancy by respondent and his wife, Iona James, and that the latter did not join in the execution of the option, does not render the option void, and "does not defeat specific performance," citing in support thereof the case of *Swartzbaugh* v. *Sampson,* 11 Cal. App. (2d) 451, 461 [54 P. (2d) 73].

The cited case was one in which a wife (joint tenant)

brought suit to cancel a lease executed by her husband (the other joint tenant) as lessor, to a third party, as lessee, without the wife's consent. It was there held (p. 457) : "It is a general rule that the act of one joint tenant without express or implied authority from or the consent of his cotenant cannot bind or prejudicially affect the rights of the latter. (*Simpson* v. *Bergmann,* 125 Cal. App. 1 [13 P. (2d) 531] ; *Oberwise* v. *Poulos,* 124 Cal. App. 247 [12 P. (2d) 156] ; *Sumner* v. *Vinson,* 211 Ky. 571 [277 S. W. 849] ; *Lawrence* v. *Fielder,* 186 Ky. 324 [216 S. W. 1068].)" But that (p. 458) "a lease to all of the joint property by one joint tenant is not a nullity but is a valid and supportable contract in so far as the interest of the lessor in the joint property is concerned. . . . (p. 461) the effect of a lease by one cotenant is to give the lessee the right to share in the possession of the leased property for the term of the lease . . . (p. 462) that all a cotenant out of possession is entitled to is to be let into possession with the lessee of his cotenant to enjoy his moiety."

The instant action is brought by third parties against husband (joint tenant) for specific performance of an agreement based upon an option which husband made with said third parties without the knowledge or consent of his wife (the other joint tenant).

"One joint tenant or tenant in common cannot bind his cotenant by any contract which he may make relating to the common property. (*Sarina* v. *Pedrotti,* 103 Cal. App. 203 [284 Pac. 472] ; 7 Cal. Jur., p. 358; 33 C. J. p. 913.) So one cotenant cannot bind his cotenants by the grant of an easement over the common property (*Pfeiffer* v. *Regents,* 74 Cal. 156 [15 Pac. 622] ; *East Shore Co.* v. *Richmond Belt Ry.,* 172 Cal. 174 [155 Pac. 999] ; *Waterford Irr. Dist.* v. *Turlock Irr. Dist.,* 50 Cal. App. 213 [194 Pac. 757] ; 7 R. C. L., p. 884), although he may by lease or license grant to another the right to enjoy the common property in his stead to the same extent that he is entitled to enjoy it by reason of his cotenancy. (*Waterford Irr. Dist.* v. *Turlock Irr. Dist., supra, Lee Chuck* v. *Quan Wo Chong & Co.,* 91 Cal. 593 [28 Pac. 45].) A joint tenant may likewise convey his interest to a stranger, in which event the grantee becomes a tenant in common with the other owner. (*Tilden* v. *Tilden,* 81 Cal. App. 535 [254 Pac. 310] ; *Green* v. *Skinner,* 185 Cal. 435 [197 Pac. 60] ; *Pepin* v.

*Stricklin,* 114 Cal. App. 32 [299 Pac. 557].)'' *(Oberwise* v. *Poulos,* 124 Cal. App. 247, 251 [12 P. (2d) 156].)

In view of the law as above stated, it would be impossible to compel respondent to perform the terms of the contract except as to his own interest in the property covered thereby, and, under the facts presented, this would have the effect of terminating the joint tenancy and making appellant a tenant in common with respondent's wife.

However, since the court found upon sufficient evidence that the contract was not fair, just or equitable insofar as respondent is concerned, he cannot be compelled to perform its terms. (§ 3391, Civ. Code.)

On the question of bad faith of respondent, this is not raised by the pleadings in the action for specific performance. Moreover, the evidence shows that respondent and appellant's officers discussed the possibility of getting Mrs. James to sign the option, and respondent told said officers he did not know whether she would sign or not. Under the circumstances, the finding of the trial court that neither respondent nor his wife acted in bad faith must be sustained.

With respect to damages, it was held in the case of *Hupp* v. *Lawler,* 106 Cal. App. 121, 125 [288 Pac. 801], quoting from *Morgan* v. *Dibble,* 43 Cal. App. 116 [184 Pac. 704]: '' 'The right to pecuniary compensation in lieu of specific performance ''assumes, of course, a sufficient contract, performance or an offer to perform by the plaintiff, and every other element requisite, on his part, to the cognizance of his case in chancery'' *(Milkman* v. *Ordway,* 106 Mass. 232, 254). There is no authority for holding that equity can grant damages unless some case of equitable relief is made out also, to which the damages would be applicable or subsidiary. An action to recover damages in lieu of specific performance lies not at law, but in equity, for the right to such damages depends upon the right to specific performance, and is not available until the latter is established'.''

Since the court found that the contract sued upon was not, as to respondent, just and reasonable, he cannot be compelled to perform (§ 3391, Civ. Code); therefore, damages cannot be assessed against him.

For the reasons stated, the judgments appealed from are, and each of them is, affirmed.

Doran, J., and White, J., concurred.